### HAGUE et al. v. COMMITTEE FOR INDUSTRIAL ORGANIZATION et al.

No. 6939.

Circuit Court of Appeals, Third Circuit.

Jan. 26, 1939.

James A. Hamill, of Jersey City, N. J., John A. Matthews, of Newark, N. J., and Charles Hershenstein and Edward J. O'-Mara, both of Jersey City, N. J., for appellants.

Spaulding Frazer, of Newark, N. J. (Spaulding Frazer and David Stoffer, both of Newark, N. J., Lee Pressman, Morris L. Ernst, Benjamin Kaplan, and Harriet F. Pilpel, all of New York City, of counsel), for appellees.

Douglas Arant, of Birmingham, Ala., Zechariah Chafee, Jr., Grenville Clark, of New York City, Chairman, Osmer C. Fitts, of Ludlow, Vt., George I. Haight, of Chicago, Ill., Monte M. Lemann, of New Orleans, La., John Francis Neylan, of San Francisco, Cal., and Joseph A. Padway, of Milwaukee, Wis., amici curiae.

Before DAVIS, BIGGS, and MARIS, Circuit Judges.

DAVIS, Circuit Judge, dissenting in part.

BIGGS, Circuit Judge.

The question presented by the appeal at bar is whether or not certain fundamental civil liberties safeguarded by the Constitution of the United States shall be observed and protected in Jersey City or shall there stand abridged.

The appellants, the defendants below, are the Mayor of Jersey City, the Director of Public Safety, the Chief of Police, and the Board of Commissioners of Jersey City. The appellees, the plaintiffs below, are the Committee for Industrial Organization, labor organizations affiliated with the CIO, individual representatives of such organizations, and the American Civil Liberties Union, a membership corporation.

The Nature of the Proceedings.

The bill of complaint alleges that the appellants have denied the appellees the right to hold lawful meetings within the territorial limits of Jersey City allegedly upon the authority of an ordinance adopted April 15, 1930. It is further alleged that

this denial was pursuant to a plan and conspiracy entered into by the appellants as public authorities of Jersey City to forbid all meetings organized by the appellees for the purposes of carrying on and discussing the work of the CIO and that to effect such ends the appellants exercised unlawful restraints upon the appellees and persons acting in sympathy with them. It is also alleged that the apellants denied the appellees and those acting in sympathy with them the right to disseminate information concerning the CIO by handbills or circulars and that this denial allegedly was pursuant to the authority of another ordinance of Jersey City passed upon January 22, 1924. It is also alleged that the appellants refused to permit picketing, excluded and deported agents of the appellees and persons acting in sympathy with them from the territorial limits of Jersey City, conducted searches and seizures without warrant or probable cause and generally harassed and molested the appellees and their agents in disregard of their constitutional rights. The bill of complaint prayed for injunctive relief. The appellants filed an answer in substance denying the charges made by the appellees, and setting up as a defense that the appellees, their sympathizers and agents invaded Jersey City to cause and create confusion and riot and to intimidate the police. At the trial, which consumed many days, voluminous testimony was taken which we will briefly summarize.

### The Evidence.

It appears that in November, 1937, the appellee William J. Carney, regional director of the CIO in New Jersey, prepared to inaugurate a drive for CIO membership in Jersey City. Learning of this fact, upon November 23, 1937, the Newark Evening News published an article headed, "CIO Prepared for Invasion—Mass Drive by 3,-000 to be Launched Monday in Jersey City." The article went on to set forth certain statements alleged to have been made by Carney to the effect that there would now be a "show down" between the CIO and Mayor Hague. Carney was also reported to have said, "We will go to Jersey City to organize in a peaceful manner. Whether this will be possible in the face of denials of civil rights in that city I am unable to say at this time." Articles of similar tenor appeared about this time in other newspapers in and about Jersey City.

The record also shows that about 6 o'clock upon the morning of November 29, 1937, a number of persons, CIO members or sympathizers, gathered or attempted to gather at the CIO headquarters at No. 76 Montgomery Street, Jersey City. We use the phrase attempted to gather because the police were present about the headquarters in force, engaged in searching individuals and confiscating circulars and handbills relating to CIO union activities. A substantial number of these individuals were deported from Jersey City by the police by placing them upon ferry boats bound for New York City or by conducting them in motor vehicles beyond the territorial limits of Jersey City. A small number of individuals were arrested and a few were tried before a city magistrate who sentenced each defendant to five days' imprisonment for the offense of illegally distributing the circulars referred to. There is evidence that the police held CIO sympathizers for a time within the CIO headquarters, searching individuals as they went out through the door into the street, and thereafter entered the premises and made further searches and some seizures of the offending handbills.

The evidence is not entirely clear as to how many persons came to Jersey City or were in Jersey City attempting to take part in CIO activities upon the morning of November 29th, but an examination of it indicates that the total number of these persons did not exceed a hundred, and their activities did not constitute an invasion within any accepted meaning of that word. What they had planned to accomplish presented no serious threat to the peace and good order of Jersey City. Upon the other hand the police of Jersey City sought to disorganize the forces of the CIO rather than to proceed in a manner calculated to preserve the civil rights of individuals. As we have stated, there were but few arrests and fewer trials. The conduct of the police upon this occasion was in gross violation of the civil rights of the persons concerned.

Within a comparatively short time thereafter the appellee American Civil Liberties Union attempted to secure a permit from the Director of Public Safety of Jersey City to hold an open air meeting in the City of Jersey City for the purpose of addressing the public upon the subject of civil liberties. The speakers were to be three members of Congress and a member of the bar of New York. At about this time also the CIO made an application for a permit for an outdoor meeting for the purpose of petitioning the Board of Commissioners of Jersey City

to modify the ordinance prohibiting the distribution of circulars and to take action in respect to the alleged intimidation of owners of halls by certain officers of Jersey City. Certain persons were named as the speakers, including a member of Congress, CIO organizers, Roger N. Baldwin, and others. Permits to hold these meetings were refused by the Director of Public Safety of Jersey City upon the ground that the meetings would lead to riots and disorder. A permit to speak was also refused to Norman Thomas, a former socialist candidate for President of the United States. A permit for a meeting was also refused to the American Whig Cliosophic Society of Princeton University, which desired to hold a public meeting in Jersey City at which Senator William E. Borah was to be the speaker. This permit was also denied upon the ground "that the said meeting would tend to create disturbance and disorderly assemblage." William M. Callahan, managing editor of "The Catholic Worker," was not granted a permit for a meeting though he stated that its purpose was to explain the Papal Encyclicals.

Protests in respect to the holding of CIO meetings were made to the Mayor and to the Department of Public Safety by organizations in and about Jersey City. These included protests of the Jersey City Chamber of Commerce, the Association of the Sons of Poland, the Catholic War Veterans, the Jersey City Lions Club, the Jersey City Real Estate Board, the Ladies of the Grand Army of the Republic and the Italian War Veterans. There is evidence that Mayor Hague and his associates inspired at least some of these protests. The evidence is uncontrovertible that he was the spearhead of the movement to keep the appellee labor groups out of Jersey City. For example, a very large mass meeting of veterans' organizations was held at the Jersey City Armory and was addressed by Mayor Hague and other persons. The record indicates that the calling together of these organizations was done upon the instructions of Mayor Hague and that he himself actively collaborated in procuring the record attendance at the armory. At least one threat of violence was voiced against the CIO and its sympathizers. Mayor Hague, however, in testifying in the court below, made plain his belief that this threat was simply one by an overzealous individual and there was no real danger of physical violence from the veterans' organizations. This mass meeting voiced its approval of the stand of the appellants in respect to the CIO and its sympathizers and protested against CIO speakers being allowed to address meetings in Jersey City.

The protests are important in that they serve as the basis expressed by the appellants for their refusal to grant permits for public meetings to the CIO and its sympathizers. While permits were refused to these persons by the Director of Public Safety, other groups whose views were not at variance with the opinions of the majority of the inhabitants of Jersey City received permits freely or the requirement of a permit was waived. It should be noted also that throughout this period of protesting mass meetings, the conduct of the police in respect to the appellees was similar to their conduct upon November 29, 1937. CIO members and sympathizers were deported from Jersey City and searches of individuals continued to be made without warrant or probable cause.

The reason given by Mayor Hague and certain of the other appellants in their testimony for such acts upon the part of the police was the necessity of preserving peace and good order in Jersey City and obviating the possibility of riot, strife and injury to the speakers and the citizens of Jersey City. It in no wise appears, however, from the record before us that the police of Jersey City would have been powerless to maintain order at any meeting proposed by the appellees.

Findings of Fact and Conclusions of the Trial Court.

After the trial of the cause the learned trial judge filed an exhaustive and able opinion and made exact and clear findings of fact and conclusions of law. He thereupon entered a decree granting the appellees substantially the relief they sought.

Among the findings of fact so made by the trial court are findings to the effect that the CIO, Steel Workers Organizing Committee, United Electrical Radio and Machine Workers of America and United Rubber Workers of America were established and are maintained for the purpose of organizing into labor unions unorganized workers and to cause such labor unions to function as collective bargaining agencies for the betterment of terms and conditions of employment; that the American Civil Liberties Union was established and is maintained for the purpose of taking measures deemed by it to be essential for the enforcement of the rights secured by the

First and Fourteenth Amendments to the Constitution of the United States, U.S.C.A. The court also found that the purposes of these appellees "are in the letter and spirit of our Constitution and laws and of the theory of our democratic institutions." The trial court also found that there was no competent proof that these appellees entertained other purposes or that the appellees or any of them "incited or advocated the overthrow of the government of the United States or the State of New Jersey by force or violence or incited or advocated the commission of any other acts in violation of the laws of the United States or the State of New Jersey."

Specifically in relation to the acts alleged by the appellees to have been committed by the appellants, the learned trial judge found that the appellants acting in their official capacities had adopted and enforced a deliberate policy of excluding and removing from the territorial limits of Jersey City the agents of the CIO and of the American Civil Liberties Union and persons acting in sympathy with them, had exercised unlawful personal restraints over these individuals and had interfered with their right of free locomotion on and free access to the public streets and parks of Jersey City. The trial court also found that such exclusions and removals, personal restraints and interferences were frequently carried out by members of the police force of Jersey City upon their own fiat and without authority of law and without bringing the persons excluded, removed or restrained before any judicial officers in order to afford such individuals the benefits of judicial hearings.

Further findings of fact state that the appellants prevented the appellees or their agents from distributing circulars and leaflets, from carrying placards or signs or otherwise publicizing the work of the CIO.

Particularly in respect to public meetings, the trial court found that the appellants officially adopted and enforced the deliberate policy of forbidding the appellees from communicating their views to the citizens of Jersey City by public gatherings or assemblies though there was competent proof that the appellants had granted permits to various persons, not associated with the appellees, to speak at meetings in the public streets of that city. The trial judge also found that there was no competent proof that the parks of Jersey City had been dedicated to any other purpose than the general recreation of the public. The trial court also found that there was no competent proof that the persons who were to speak at the meetings proposed by the appellees were such that any of them "either in their choice of words or in the manner of uttering the words chosen" would violate canons of decent discussion or speak such words that breaches of the peace would ensue. The trial judge found also that the appellants had caused permits to be refused for the holding of outdoor meetings of citizens to be addressed by the divers persons, sympathizers of the appellees, named in the findings of fact.

As a matter of law the trial court held that the appellants' deliberate official policy and acts were in violation of the rights of the appellees under the Fourteenth Amendment and the Commerce Clause (Art. 1, § 8, cl. 3) of the Constitution of the United States, U.S.C.A.[1] These are the substantive questions of law presented by this appeal. A question of jurisdiction is also raised and will be considered later in this opinion.

### The Questions of Law.
### As to Liberty of the Person.

*As to Exclusion and Removal of Individuals from Jersey City.*

■ Individuals coming into or going about a city upon their lawful concerns must be allowed free locomotion upon the streets and public places.

■ Section 1 of the Fourteenth Amendment to the Constitution of the United States provides, inter alia, that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; * * *". There is no doubt that the right of an individual to pass with freedom of movement and without molestation between the States of the Union is one of the privileges of federal citizens which is protected by this clause. As was stated in Williams v. Fears, 179 U.S. 270, 274, 21 S.Ct. 128, 129, 45 L.Ed. 186, "Undoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any state is a

---

[1] The findings of fact, conclusions of law and decree of the trial court are set out in hæc verba in an appendix to this opinion along with the two ordinances of Jersey City referred to.

right secured by the 14th Amendment and by other provisions of the Constitution." See Crandall v. Nevada, 6 Wall. 35, 36, 18 L.Ed. 745; Colgate v. Harvey, 296 U. S. 404, 56 S.Ct. 252, 80 L.Ed. 299, 102 A. L.R. 54; United States v. Miller, D.C., 17 F.Supp. 65, 67; Marcus Brown Holding Co. v. Pollak, D.C., 272 F. 137, 141; In re Ah Fong, 1 Fed.Cas., pp. 213, 217, No. 102; Twining v. New Jersey, 211 U.S. 78, 97, 29 S.Ct. 14, 53 L.Ed. 97.

■ The record before us shows numerous instances where CIO sympathizers were removed from Jersey City by police officers acting with the approval of the appellants. The findings of fact of the trial court in this regard are fully supported by the evidence and injunctive relief was properly granted.

### As to Unlawful Searches and Seizures.

■ The Fourth Amendment to the Constitution of the United States provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, * *". The right so protected is a fundamental civil right and in our opinion is a privilege of Federal citizenship. As such it is secured against abridgment by the states by the privileges or immunities clause of the Fourteenth Amendment as well as by the due process clause of that Amendment. We shall consider this question further when dealing with the jurisdiction of the court below.

■ Constitutional provisions granting freedom from unlawful searches and seizures are "of the very essence of constitutional liberty." Gouled v. United States, 255 U.S. 298, 304, 41 S.Ct. 261, 263, 65 L.Ed. 647; Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374. Searches and seizures are unreasonable if they are carried out without probable cause. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790; United States v. O'Connell, D.C., 43 F.2d 1005. As was so succinctly stated by Judge Woods of the Circuit Court of Appeals for the Fourth Circuit in Elrod v. Moss, 278 F. 123, 130, "* * * to justify search and seizure * * * without warrant, the officer must have direct personal knowledge, through his hearing, sight, or other sense,

of the commission of the crime by the accused."

■ In the case at bar the searches and seizures were made without probable cause, without personal knowledge upon the part of the searching officer and in fact without any crime or crimes having been committed.

It is apparent therefore that the injunctive relief from unreasonable searches and seizures given to the appellees by the court below was granted providently.

### As to Interferences in General.

An examination of the record leads us to the conclusion that the police of Jersey City pursued a course of conduct towards the appellees which possessed no sanction whatsoever in statute or ordinance. The appellees contend that, "If the police policy were in terms embodied in a criminal statute * * *" such a statute would be unconstitutional. They cite the language of Mr. Justice Brandeis in Senn v. Tile Layers Protective Union, 301 U.S. 468, 478, 57 S.Ct. 857, 862, 81 L.Ed. 1229, stating, "Members of a union might, without special statutory authorization by a state, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution." It is demonstrated by the record in the case at bar that though there is no ordinance of Jersey City which deals specifically with the right of picketing in labor disputes, none the less the practical effect of the actions of the police in the case at bar was to prohibit picketing except upon terms and conditions imposed by the individual members of the police force.

■ It follows that when members of a police force remove individuals from a picket line, deport them from the territorial limits of a city or detain them in police custody under guise of arrest and release them without charges and without trial, the police are acting in defiance of due process of law as guaranteed by the Fourteenth Amendment. When, as in the case at bar, such conduct receives the consent and approbation of those charged with the conduct of city government, justice is destroyed. Such a condition is abhorrent in a democratic community.

■ An individual has a right to trial by properly constituted judicial authority upon a defined standard of criminal responsibility set forth by statute or ordinance.

He must have the opportunity to be heard and to call witnesses in his own defense. This is the very essence of due process of law as prescribed by the Fourteenth Amendment. Powell v. Alabama, 287 U.S. 45, 68, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; Snyder v. Massachusetts, 291 U.S. 97, 122, 54 S.Ct. 330, 78 L.Ed. 674, 90 A. L.R. 575; United States v. Ballard, D.C., 12 F.Supp. 321, 325.

■ The findings of the trial court in respect to the issues under this heading are fully supported by the evidence and injunctive relief was properly granted.

### As to Liberty of the Mind.

*Interference with the Distribution of Handbills and the Carrying of Signs.*

■ An ordinance of Jersey City passed by its Board of Commissioners upon January 22, 1924, provides in part that "No person shall distribute or cause to be distributed or strewn about any street or public place any newspapers, paper, periodical, book, magazine, circular, card or pamphlet," and prescribes severe penalties for its breach. There are no licensing provisions in the ordinance and the prohibition it contains is absolute.

Such an ordinance is invalid upon its face in that it violates freedom of speech and of the press, fundamental civil rights protected by the Fourteenth Amendment from any abridgment by State action. It is squarely within the decision of the Supreme Court of the United States in Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949.

Indeed, we do not understand that the appellants themselves today contend to the contrary. As we apprehend their position, it is to the effect that there was no need to lay the burden of an injunction upon them since they themselves are prepared to respect and honor the ruling of the Supreme Court. The record shows clearly, however, that for some time after the handing down of the decision in Lovell v. City of Griffin, supra, the police of Jersey City continued their practice of refusing to permit the distribution of handbills by the sympathizers of the appellees upon the streets and in the public places of Jersey City.

■ The posting of placards and signs in public places is part of the freedom of the press. In our opinion such is clearly within the principle of Lovell v. City of Griffin, supra.

■ The findings of the trial court as to the violation of these fundamental civil rights by the appellants are fully supported by the evidence and the injunctive relief granted is affirmed.

*As to the Right of Free Assembly, the Holding of Meetings upon the Streets or in the Public Parks of Jersey City.*

An ordinance of Jersey City adopted April 15, 1930 by the Board of Commissioners provides that "* * * no public parades or public assembly in or upon the public streets, highways, public parks or public buildings of Jersey City shall take place or be conducted until a permit shall be obtained from the Director of Public Safety." The ordinance also states that the Director of Public Safety is authorized to grant permits for parades and public assembly "* * * upon application made to him at least three days prior to the proposed parade or public assembly." The ordinance provides further that the Director of Public Safety is authorized to refuse a permit "* * * when, after investigation of all of the facts and circumstances pertinent to said application, he believes it to be proper to refuse the issuance thereof; provided, however, that said permit shall only be refused for the purpose of preventing riots, disturbances or disorderly assemblage." Substantial penalties are provided for the violation of the ordinance.

It is the contention of the appellants that permits for the holding of public meetings in Jersey City were properly refused to the appellees because such meetings would have resulted in riots and disorderly assembly.

■ ■ We are of the opinion that the ordinance is unconstitutional in view of the fact that it permits the imposition of previous restraint upon the right of the individual to speak before an assembly of his fellows in a public place. The ordinance therefore prohibits peaceable assembly except upon terms repugnant to free speech. Freedom of speech and of the press are fundamental civil rights which are safeguarded to the individual by the due process clause of the Fourteenth Amendment.

As was stated by Mr. Chief Justice Hughes, delivering the opinion of the Supreme Court in De Jonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 260, 81 L.Ed. 278, "These rights may be abused by using speech or press or assembly in order to

incite to violence and crime. The people through their Legislatures may protect themselves against that abuse. But the legislative intervention can find constitutional justification only by dealing with the abuse. The rights themselves must not be curtailed."

The refusal of the courts to allow previous restraint to be imposed upon the freedom of the press is well exemplified by the decision of the Supreme Court of the United States in Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 628, 75 L.Ed. 1357. In the cited case a statute of Minnesota, Chapter 285 of the Session Laws of Minnesota for the year 1925. See Mason's Minnesota Statutes, 1927, §§ 10123-1 to 10123-3, provided for the abatement, as a public nuisance, of "* * * a malicious, scandalous and defamatory newspaper" and authorized suits in the name of the State to abate such periodicals and to enjoin publishers from further violations. Such a suit was brought against "The Saturday Press" published in Minneapolis. From the opinion of the Supreme Court it appears that the articles contained in The Saturday Press were inflammatory and had led to actual violence. By its decision the Supreme Court of the United States reversed a decree of the Supreme Court of Minnesota sustaining an injunction abating the publication of the periodical. Mr. Chief Justice Hughes, delivering the opinion of the Court, stated: "It is no longer open to doubt that the liberty of the press and of speech is within the liberty safeguarded by the due process clause of the Fourteenth Amendment [U.S.C.A.Const.] from invasion by state action. It was found impossible to conclude that this essential personal liberty of the citizen was left unprotected by the general guaranty of fundamental rights of person and property."

The Chief Justice went on to state, "If we cut through mere details of procedure, the operation and effect of the [Minnesota] statute in substance is that public authorities may bring the owner or publisher of a newspaper or periodical before a judge upon a charge of conducting a business of publishing scandalous and defamatory matter. * * * This is of the essence of censorship.

"The question is whether a statute authorizing such proceedings in restraint of publication is consistent with the conception of the liberty of the press as historical-ly conceived and guaranteed. In determining the extent of the constitutional protection, it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication. * * *"

The Chief Justice also stated, "Equally unavailing is the insistence that the statute is designed to prevent the circulation of scandal which tends to disturb the public peace and to provoke assaults and the commission of crime. Charges of reprehensible conduct, and in particular of official malfeasance, unquestionably create a public scandal, but the theory of the constitutional guaranty is that even a more serious public evil would be caused by authority to prevent publication. 'To prohibit the intent to excite those unfavorable sentiments against those who administer the Government, is equivalent to a prohibition of the actual excitement of them; and to prohibit the actual excitement of them is equivalent to a prohibition of discussions having that tendency and effect; which, again, is equivalent to a protection of those who administer the Government, if they should at any time deserve the contempt or hatred of the people, against being exposed to it by free animadversions on their characters and conduct.' There is nothing new in the fact that charges of reprehensible conduct may create resentment and the disposition to resort to violent means of redress, but this well-understood tendency did not alter the determination to protect the press against censorship and restraint upon publication. As was said in New Yorker Staats-Zeitung v. Nolan, 89 N.J.Eq. 387, 388, 105 A. 72: 'If the township may prevent the circulation of a newspaper for no reason other than that some of its inhabitants may violently disagree with it, and resent its circulation by resorting to physical violence, there is no limit to what may be prohibited.' The danger of violent reactions becomes greater with effective organization of defiant groups resenting exposure, and, if this consideration warranted legislative interference with the initial freedom of publication, the constitutional protection would be reduced to a mere form of words."

In Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 449, 80 L.Ed. 660, the Supreme Court held that the predominant purpose of the grant of immunity there invoked by the appellees, viz., the immunity granted by the Fourteenth Amendment, was "* * * to preserve an un-

784

trammeled press as a vital source of public information." The Supreme Court thereupon proceeded to affirm the decree of the court below declaring unconstitutional a so-called licensing tax sought to be imposed upon the appellees by the State of Louisiana (La.Act No. 23, July 12, 1934). See also Dearborn Publishing Co. v. Fitzgerald, D.C., 271 F. 479.

There is strong analogy between the right freely to publish the written or printed word and the right here in issue freely to speak in a public assembly. It may be argued that inflammatory words spoken before an audience may lead more quickly to violence than the printed word dispersed throughout a city. The question, however, is one of degree. Free speech and free assembly are commonplaces of democratic governments. They are unheard of under totalitarian regimes. In New York and in London, cities possessing populations as diverse as Jersey City, free speech and free assembly are allowed as a matter of course and speakers may there call even for the destruction of existing laws and governments and be received with tolerance or amusement.

 The rights of free speech and free assembly are essential parts of our American heritage. If the words used by a speaker are slanderous, the injured person may sue for damages in a court at law. If the speaker incites to riot or crime, the police may arrest him forthwith and the criminal processes of a democracy are available to punish him. In his concurring opinion in Whitney v. People of State of California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095, in which the question before the court was one of punishment of the defendant, she having spoken in defiance of the Criminal Syndicalism Act of California (Statute 1919, c. 188, p. 281), Mr. Justice Brandeis stated at page 378, 47 S.Ct. at page 649, "The fact that speech is likely to result in some violence or in destruction of property is not enough to justify its suppression. There must be the probability of serious injury to the State. Among free men the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech and assembly." We can perceive no valid reason why the situation should be otherwise in Jersey City. Speakers may not be prohibited from speaking because they may say something which will lead to disorder. The function of the police at public meetings is not to prevent speakers from presenting their views but to preserve order while they speak. Otherwise, freedom of speech and assembly is destroyed.

The interpretation of the rights of free speech and free assembly contended for by the appellants is shocking and places these rights in the hands of those who would destroy them. If the ill-intentioned threaten riot, speech may not be had. Under what conditions then would not the cry of riot be raised? Applying the appellants' doctrine literally, political speakers might not stump a city in an election if their opponents objected to what they had to say and threatened disorder. The strict application of such a rule would result eventually in the existence of but one political party as is now the case under totalitarian governments.

The rule contended for by the appellants is scarcely one which commends itself to practical democratic government. Nor do we think that the appellants have followed such a rule. The record shows that the appellees and their sympathizers were not permitted to speak because they were deemed to be undesirables by the city authorities. The cries of impending riot raised by the appellants are not candid. In other words, Mayor Hague and his associates, reversing the usual procedure, troubled the waters in order to fish in them.

 There are of course both proper and improper times and places for holding public meetings. It is difficult to conceive a time when a public meeting might properly be held at Broad and Chestnut Streets in Philadelphia or at Broadway and Forty-Second Street in New York City. If public meetings are to be held upon the streets of a city, they must be held at such places or such times as will permit them not to interfere unreasonably with the traffic and all that it implies. Such a rule, however, should not be too narrow a one, for if a public meeting is held, it is to be assumed that volume of traffic will be increased. If mass meetings are to be held in public parks, they must be held at such times and in such localities that they will not unduly interfere with the public recreation to which parks are dedicated. A statute or ordinance embodying these principles of regulation would in our opinion be constitutional.

Much emphasis is placed by the appellants upon the decision of the Supreme Court in Davis v. Massachusetts, 167 U.S. 43, 17 S.Ct. 731, 42 L.Ed. 71, upon appeal from a decision of the Supreme Judicial Court of Massachusetts, Commonwealth v. Davis, reported in 162 Mass. 510, 39 N.E. 113, 26 L.R.A. 712, 44 Am.St.Rep. 389. In the cited case an ordinance of Boston forbade speaking on the Common without a permit from the city authorities. Davis desired to use the Common for religious services. He proceeded to speak without asking for a permit and was arrested and convicted. Upon the appeals that conviction was sustained.

The Davis case, however, may be distinguished upon its circumstances from that at bar. As we have stated, Davis never applied for a permit to the city authorities. In the case at bar, the appellees sought permits in accordance with the terms of the Jersey City ordinance and permits were denied to them. Upon the question of the constitutionality of the ordinance now under discussion, however, it is in point and we cannot state otherwise. In our opinion, however, the rule laid down in the Davis case has been modified by the later decisions of the Supreme Court in Gitlow v. People of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138; Fiske v. Kansas, 274 U.S. 380, 47 S.Ct. 655, 71 L. Ed. 1108; De Jonge v. Oregon, supra; Near v. Minnesota, supra, and Lovell v. City of Griffin, supra. In these later cases the Supreme Court declared the modern doctrine of protection of liberty of speech and assembly against state and municipal restrictions and made plain by judicial interpretation that the freedom of press and speech expressly protected by the First Amendment of the Constitution against Federal interference was also protected by the Fourteenth Amendment against interference by the States. Moreover, in the Davis case there is but small discussion of civil liberties. The Supreme Court took the position that " * * * for the legislature * * * to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house." [167 U.S. 43, 17 S.Ct. 733.] This view of the powers of city authorities in respect to a public park, viz., likening them to the powers of an individual over his own dwelling, does not seem consonant with the expressions of the Supreme Court upon germane subjects

in a later period. On the contrary we think it cannot now be doubted that a city owns and its officials administer its streets and parks, not as private proprietors, but as trustees for the people. While streets and parks are to be administered primarily for the use of the people for travel and recreation it is equally certain that, consistent with such uses, the public places of a city must be open for the use of the people in order that they may exercise their rights of free speech and assembly. If this were not so it is obvious that these rights would be but empty forms for those unable to obtain suitable private places in which to exercise them.

The Ordinance Has Been Administered In An Unconstitutional Manner.

But even if we were to assume that the ordinance of Jersey City under consideration is valid and constitutional, none the less we find that it has been administered in a discriminatory and therefore unconstitutional manner.

The learned trial judge in three of his findings of fact treats the past performances of the speakers designated by the appellees, whether they have spoken with decency and without causing disorder, as constituting the test, or at least the most important single factor of the test, as to whether they will cause disorder if permitted to speak. He then found as a fact that none of the speakers designated by the appellees had ever spoken at any public meetings in the open air at the places designated in the applications for permits and that none of the designated speakers in past performances had ever given reasonable grounds for belief that breaches of the peace would result from their utterances. The test so applied by the trial judge seems to us to be a proper one if it be conceded that previous restraint may be imposed. We can conceive of no other unless the speeches sought to be given are subjected to prior censorship by the authorities, a course completely incompatible with the right of free speech and assembly. The findings of fact referred to are fully supported by the evidence.

We can find no competent evidence from the record before us that violence or disorder would have resulted either from the meetings which the appellees desired to hold or from the words which the speakers were likely to deliver at such meetings. Nor was there any reasonable apprehension that the public in Jersey City would have

786

rioted. The record, however, presents an extraordinary fact. The Mayor of Jersey City and the other appellants endeavored to build up a dangerous situation, one in which sympathizers of the appellees could not safely speak. That such efforts did not result in actual danger seems to us to have resulted rather from the good sense of the citizens than from the good will of Mayor Hague and his associates. As we have stated, while denying permits to the appellees and their sympathizers, the appellants granted permits for meetings to other groups. Discrimination is therefore plainly shown.

Such conduct upon the part of the appellants is in violation of the due process and equal protection clauses of the Fourteenth Amendment. The criterion imposed by the authorities of Jersey City upon the right to speak therein is simply whether or not the individual who is to speak is a right thinking person in the view of those who constitute the city authorities. No other test is applied. The authorities upon this subject are very clear. In Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352, 38 S.Ct. 495, 62 L.Ed. 1154, Mr. Justice McReynolds, delivering the opinion of the Supreme Court, stated, "The purpose of the equal protection clause of the Fourteenth Amendment [U.S. C.A.Const.] is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."

In Concordia Fire Insurance Co. v. Illinois, 292 U.S. 535, 545, 54 S.Ct. 830, 834, 78 L.Ed. 1411, Mr. Justice Van Devanter stated, "Whether a state statute is valid or invalid under the equal protection clause of the Fourteenth Amendment [U.S.C.A. Const.] often depends on how the statute is construed and applied. It may be valid when given a particular application and invalid when given another." See also Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, and People ex rel. Doyle v. Atwell, 232 N.Y. 96, 102, 103, 133 N.E. 364, 367, wherein Cardozo, J., stated, "The mayor refused a permit, it is said, because the applicants were Socialists. If that is so he was guilty of a grave abuse of power."

The appellants contend that the ordinance does not concern itself with speech at all and does not attempt to regulate what may or may not be said at public meetings; that it was designed merely to regulate the manner in which the streets and public places of the city might be used. The appellants argue this is a valid exercise of the police power and does not infringe or abridge any of the constitutional rights of the appellees. This is really the contention that the ordinance is valid and constitutional upon its face, a contention which we have dealt with in an earlier part of this opinion. It is obvious that whether the ordinance be valid upon its face or otherwise, none the less it has been used by the authorities of Jersey City for abridging the rights of free speech and free assembly.

The findings of fact made by the trial judge upon this phase of the case are supported fully by the evidence and the injunctive relief sought by the appellees was properly granted to them.

### As to the Defense of Unclean Hands Advanced by the Appellants.

The appellants urge that the appellees are not entitled to the injunctive relief granted them because they come into court with unclean hands. This contention is controverted by the express finding of the trial court that there was no competent proof that the appellees had so conducted themselves as to forfeit the protection of a court of equity. Our conclusions are substantially similar to those of the trial judge. We think that an American community, devoted to American principles, cannot exist upon the terms offered by the appellants. Minorities, however unpopular, must be allowed to make their voices heard and the whipping up of public indignation and public clamor to the end that free expression of opinion and free assembly may not be had sits with little grace upon the officials of an American city. Fundamental civil liberties must not be tampered with if our system of democratic government is to survive.

We do not find the appellees guilty of having unclean hands.

### As to the Enforcement of the Decree.

The appellants contend that it is not feasible for the court below to enforce the provisions of the decree entered by it and that therefore it should not have been made. Giles v. Harris, 189 U.S. 475, 23 S. Ct. 639, 47 L.Ed. 909. More specifically, the appellants' contention is that it would require the court below to exercise super-

visory powers over the administration of government in Jersey City and to interfere with the orderly exercise of governmental duties. The appellants also contend that the court below has in effect constituted itself an ordinance making body and has involved itself directly in the administration of the public business of Jersey City.

We consider these objections to the decree to be without merit and consider it unnecessary to treat them in detail. We state that in our opinion the decree is enforcible and does not substitute the will of the court for that of the governing authority of Jersey City. Moreover, the decree is carefully worded. The police are left free to pursue the duties placed upon them by law, and in so far as they act within the scope of the law their activities are in no wise interfered with or hindered. The authorities of Jersey City, by the terms of the decree carefully drawn by the court below, are free to carry out their duties in respect to preserving the safety of the lives and property of the inhabitants of Jersey City within the structure of existing law.

In our opinion, however, paragraph 4 (d) of the decree requires modification in that it enjoins the appellants from enforcing their deliberate policy of forbidding the appellees or their sympathizers to hold meetings upon the public streets or places of Jersey City other than parks, "unless and until" the appellants, acting in their official capacities, adopt and enforce a deliberate policy of forbidding meetings of any kind upon the streets or public places of Jersey City, other than parks. For the reasons heretofore stated it is our opinion that the clause of paragraph (d) beginning with the word "and" in the seventh line thereof and ending with the word "City"[2] in the twelfth line thereof should be stricken from the injunction, enlarging it as will appear.

As to the Questions of Jurisdiction.

Much of the argument of counsel and of the briefs of the parties has been devoted to the question of whether there was jurisdiction of the cause in the court below. In our opinion the issue of jurisdiction must be resolved in favor of the appellees, not only under the provisions of Section 24(1) of the Judicial Code, 28 U.S.C.A. § 41(1), but also under the provisions

of subsection 14 of that section, 28 U.S.C.A. § 41(14). We will deal first with the last mentioned but more vital section.

### As to Jurisdiction Under Section 24(14) of the Judicial Code.

The appellants contend that the fundamental civil rights here in issue were brought into the American Colonies from England and therefore antedated the adoption of the Federal Constitution. They also contend that these rights were not secured to citizens of the United States by the Constitution in the sense that they were created in the first instance by that instrument. It follows therefore, contend the appellants, that the court below did not have jurisdiction of the cause at bar under the provisions of Section 24(14) of the Judicial Code, 28 U.S.C.A. § 41(14), because that subsection relates only to rights "secured by the Constitution" in the sense the appellants have indicated, while the rights sub judice were not secured to the appellees by the Constitution in that sense.

The appellants refer to the right of freedom from unreasonable searches and seizures and state that it is elementary that this right granted by the Fourth Amendment is protected by that Amendment only against abridgment by the Federal government. The appellants point out that because the right to be free of unreasonable searches and seizures is set forth in the Bill of Rights, it is proven that this right existed in the states prior to the adoption of the Constitution.

This is of course true and it is elementary that the Bill of Rights was designed as a curb upon the power of the Federal government which it was feared might encroach upon the rights of the states. We are unable to perceive any reason, however, why the right to be free from unreasonable searches and seizures set forth in the Fourth Amendment should not stand upon a parity today with freedom of religion, of speech, of the press and of assembly as guaranteed by the First Amendment. All of these rights are of equal importance to the individual and in our opinion they stand as pari materia.

Liberty of the person, including freedom of locomotion, is, as we have seen, one of " * * * the privileges or immunities

---

[2] The precise language is as follows: " * * * and unless and until the defendants acting in their official capacities adopt and enforce the deliberate policy of forbidding meetings of any kind on any of the public streets, highways, thoroughfares or places of the City of Jersey City * * *."

of citizens of the United States * * *" protected by the Fourteenth Amendment against abridgment by the states. Among those rights and liberties of which the states may not deprive the individual under the due process clause of that Amendment are freedom of speech, Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484, and freedom of the press, Gitlow v. New York, supra. In our opinion freedom from unreasonable searches and seizures is included as well.

These fundamental civil rights were secured to the individual against infringement by the Federal government by the First and Fourth Amendments. In a very real sense thus they became privileges of Federal citizenship. Consequently they are among the privileges of citizens of the United States as distinguished from those appertaining purely to state citizenship and are privileges which no state may abridge under the Fourteenth Amendment. Protected from abridgment by the Federal government by the First and Fourth Amendments, they are protected from abridgment by the states by the Fourteenth Amendment. See Colgate v. Harvey, supra, at page 428, 56 S.Ct. at page 258, wherein it was stated by Mr. Justice Sutherland, "* * * a state cannot, under the Fourteenth Amendment, [U.S.C.A.Const.] abridge the privileges of a citizen of the United States, albeit he is at the same time a resident of the state which undertakes to do so. * * *" See also the Slaughter House Cases, 16 Wall. 36, 79, 21 L.Ed. 394, in which Mr. Justice Miller described the right of peaceful assembly as a privilege of citizens of the United States. It follows therefore that the fundamental civil rights secured to citizens of the United States by the First and Fourth Amendments are secured in the sense of being protected or guaranteed against interference by State action by the Fourteenth Amendment.

To discuss now the specific statutes under which jurisdiction is invoked in the suit at bar, R.S.1979, 8 U.S.C.A. § 43, provides that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Section 24, subdivision fourteenth of the Judicial Code, 28 U.S.C.A. § 41 (14), gives the district courts of the United States original jurisdiction, without regard to the amount in controversy, "* * * of all suits at law or in equity authorized by law to be brought by any person to redress the deprivation, under color of any law, statute, ordinance, regulation, custom, or usage, of any State, of any right, privilege, or immunity, secured by the Constitution of the United States, or of any right secured by any law of the United States providing for equal rights of citizens of the United States, or of all persons within the jurisdiction of the United States." These provisions were brought forward from Section 1 of the Act of April 20, 1871, c. 22, 17 Stat. 13, 8 U.S.C.A. § 43 note, entitled "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes." It is clear therefore that they refer to the civil rights secured by the Fourteenth Amendment, including those fundamental rights which are involved in this suit. See Holt v. Indiana Manufacturing Co., 176 U.S. 68, 20 S.Ct. 272, 44 L.Ed. 374.

Since the statutory provisions set out above were enacted originally to enforce recognition by the states of the civil rights secured by the Fourteenth Amendment and in view of the fact that the civil rights to which the Fourteenth Amendment affords protection are secured by it only in the sense of being protected or guaranteed against invasion by the states, we think that it is entirely clear that Section 24 (14) of the Judicial Code uses the phrase "secured by the Constitution" in that sense which is its plain and ordinary meaning, viz., to put beyond hazard of losing.

In the case of Smith v. United States, 8 Cir., 157 F. 721, decided in 1907, a contention similar to that of the appellants was made in respect to the interpretation of rights under the Thirteenth Amendment, U.S.C.A.Const., by the defendants with regard to the jurisdiction of a district court of the United States to try them upon an indictment which charged them with conspiracy to place negroes in a condition of involuntary servitude. Freedom from involuntary servitude is as important as, and bears a status precisely similar to, freedom of religion, of speech and of the press. The Circuit Court of Appeals for

the Eighth Circuit demolished the argument. Judge Adams stated, pages 724, 725, "A complete answer to defendants' contention is afforded by the fact that the statute[3] protects a right 'secured' by the Constitution and laws; not one originating in, created, or granted by them. * * *

"A right which has been conferred by law is manifestly secured by that law. Such concession, however, is no authority for the contention that a right secured by law must necessarily have been conferred by some law."

But if we were of the opinion that the words used in the statute "secured * * * by the Constitution" mean created in the first instance by the Constitution we would still be compelled to hold that these rights were secured by the Constitution since, as we have seen, they were secured in that sense to the people of this country by the First and Fourth Amendments which conferred these rights upon citizens of the Federal government and protected them against infringement by that government.

▆ Consequently it follows that upon either view, since the suit at bar was brought to secure the protection and enforcement of rights of which the appellees had been deprived by the appellants, it was authorized by R. S. § 1979, quoted above, and the District Court had jurisdiction of the cause by virtue of the provisions of Section 24 (14) of the Judicial Code.

As to Jurisdiction under Section 24(1) of the Judicial Code.

▆ We are of the opinion that the court below also had jurisdiction of the cause under the first subdivision of Section 24 of the Judicial Code, 28 U.S.C.A. § 41(1), which provides that the District Courts of the United States shall have original jurisdiction " * * * of all suits of a civil nature, at common law or in equity, * * where the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000, and (a) arises under the Constitution or laws of the United States

* * *". It is obvious that the suit at bar arises under the Fourteenth Amendment and the only question which remains to be determined is the value of the matter in controversy.

▆ As we have seen, the suit involves the deprivation of civil rights. R.S. §§ 1979 and 1980, 8 U.S.C.A. §§ 43, 47, give to the individuals thus deprived a right of action at law. Irrespective of these statutes, however, a right of action in the individual for damages for loss of political rights existed at common law. Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759. Such an action sounds in tort and the jury may award exemplary or punitive damages. Barry v. Edmunds, 116 U.S. 550, 6 S.Ct. 501, 29 L.Ed. 729; Wiley v. Sinkler, 179 U.S. 58, 21 S.Ct. 17, 45 L.Ed. 84. In such an action the jurisdictional sum is to be determined by the amount claimed by the plaintiff in his complaint or declaration, Hulsecamp v. Teel, Fed.Cas. No. 6862, 2 Dall. 358, 1 L.Ed. 414; Wiley v. Sinkler, supra, including an amount claimed by way of punitive damages, Ragsdale v. Rudich, 5 Cir., 293 F. 182, unless it appears from the complaint or declaration that it is not possible for the plaintiff to recover the amount claimed or that the amount is claimed fraudulently in order to create jurisdiction in the court. Smithers v. Smith, 204 U.S. 632, 27 S.Ct. 297, 51 L.Ed. 656. This rule applies as well to suits in equity. Maurel v. Smith, D.C., 220 F. 195.

▆ In the suit at bar the amount in controversy is to be determined by the value of the civil rights of which the appellees were deprived in the past and which are threatened with loss in the future. The value is to be measured by the amount of damages which might be recovered by the appellees in an action at law. In the bill of complaint the appellees aver that the amount in controversy exceeds $3,000, exclusive of interest and costs. The court below found that the rights of the appellees and of each of them which had been abridged or destroyed by the appellants had a

---

[3] R.S. § 5508 (18 U.S.C.A. § 51), which is as follows:

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same, or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than $5,000 and imprisoned not more than ten years, and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States."

value to each appellee in excess of $3,000, exclusive of interest and costs. This was in effect a finding by the court that each of the appellees might have recovered such a sum in damages for each deprivation of a right. It was also the equivalent of a finding that the amount claimed by the appellees to be in controversy was averred by them in good faith.

In our opinion the court below would not have been justified in holding otherwise. Wiley v. Sinkler, supra. Its finding is precisely similar to that of a jury in an action for damages brought to redress the deprivation of civil rights and was not required to be based on specific evidence as to the value but rather upon the trial judge's own knowledge and opinion as to the value and as to the exemplary or punitive damages which might be reasonably awarded. Wayne v. Venable, 8 Cir., 260 F. 64.

### As to the Capacity of Certain of the Appellees to Maintain the Action at Bar.

The appellants contend that because one of the appellees is a corporation and others are unincorporated associations they are not entitled to enjoy some of the civil rights which are the subject of the suit. All of the appellees referred to however are membership corporations or associations and it clearly appears that the suit was brought by them for the benefit of their members. In our opinion these appellees were proper parties and able to conduct the suit in representative capacities on behalf of the interests of their respective members. International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293.

### As to the Contention That the Actions of the Appellants Did Not Constitute State Action.

The appellants also contend that their actions complained of by the appellees did not constitute action by the State of New Jersey within the prohibition of the Fourteenth Amendment. The acts enjoined by the court below were of three types: (1) acts pursuant to the express mandate of city ordinances found to be void on their face; (2) acts carried on under color of city ordinances discriminatively and therefore unconstitutionally applied; and (3) acts not under the authority of any ordinance or statute but committed under color

of municipal office and as part of a deliberate munincipal policy.

As to the first class, we entertain no doubt but that the appellants' acts constituted action by the state since an ordinance adopted by a city under authority of state legislation[4] has been held to be an act of the state within the meaning of the Fourteenth Amendment. New Orleans Water-Works Co. v. Louisiana Sugar Refining Co., 125 U.S. 18, 8 S.Ct. 741, 31 L.Ed. 607. The actions of the appellants in the second category must be held likewise to be state actions. Fidelity & Deposit Co. v. Tafoya, 270 U.S. 426, 46 S.Ct. 331, 70 L.Ed. 664. Indeed, there is no doubt that the provisions of the Fourteenth Amendment guaranteeing equal protection of the law are violated if, as the court below found in the case at bar, municipal officers failed systematically to enforce an ordinance equally against all the members of the class affected by it. Cumberland Coal Co. v. Board of Revision, 284 U.S. 23, 52 S.Ct. 48, 76 L.Ed. 146. The third category of acts must also be held to be the acts of the State within the meaning of the Fourteenth Amendment. Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676; Home Telephone & Telegraph Co. v. Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 315, 57 L.Ed. 510. As Chief Justice White said of the Fourteenth Amendment in the case last cited, "It provides, therefore, for a case where one who is in possession of state power uses that power to the doing of the wrongs which the Amendment forbids, even although the consummation of the wrong may not be within the powers possessed, if the commission of the wrong itself is rendered possible or is efficiently aided by the state authority lodged in the wrongdoer. That is to say, the theory of the Amendment is that where an officer or other representative of a state, in the exercise of the authority with which he is clothed, misuses the power possessed to do a wrong forbidden by the Amendment, inquiry concerning whether the state has authorized the wrong is irrelevant, and the Federal judicial power is competent to afford redress for the wrong by dealing with the officer and the result of his exertion of power."

### As to the Adequacy of the Appellees' Remedy at Law.

The appellants contend that the appellees have a full and adequate remedy at law and that therefore the causes of

---

4 See P.L.1882, N.J., p. 47, as amended by P.L.1901, N.J., p. 78, R.S.N.J.1937, 40:167–2.

action set up in the bill of complaint are not cognizable in equity. In our opinion this contention cannot be sustained. The record clearly shows a shocking and constant disregard of the basic civil rights of the appellees by the appellants. These acts were torts and their threatened continuance is sufficient ground for the equitable relief sought and granted. Terrace v. Thompson, 263 U.S. 197, 214, 44 S.Ct. 15, 68 L.Ed. 255; Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 11, 12, 19 S.Ct. 77, 43 L.Ed. 341; Osborne & Co. v. Missouri Pacific R. Co., 147 U.S. 248, 258, 13 S.Ct. 299, 37 L. Ed. 155.

The decree of the court below is modified as heretofore indicated in this opinion by striking from paragraph 4 (d) of the injunction the words of limitation heretofore specified and is in all other respects affirmed.

## APPENDIX.

### Findings of Fact and Conclusions of Law of the Trial Court.

#### Findings of Fact.

##### A. Parties.

1. Plaintiff Committee for Industrial Organization is a voluntary unincorporated committee having its principal office in the District of Columbia. Plaintiffs Steel Workers Organizing Committee, United Electrical Radio and Machine Workers of America, and United Rubber Workers of America, are voluntary unincorporated labor organizations affiliated with plaintiff Committee for Industrial Organization. Plaintiff William J. Carney is director for the State of New Jersey of plaintiff Committee for Industrial Organization, and plaintiffs William J. Traynor, William P. McGinn, Samuel Macri, James P. Sweeney and Daniel J. Foley are field representatives of the Committee for Industrial Organization under the supervision of plaintiff William J. Carney.

2. Plaintiff American Civil Liberties Union is a membership corporation having its principal office in the City of New York.

3. Defendant Frank Hague is Mayor of the City of Jersey City, defendant Daniel J. Casey is Director of Public Safety of Jersey City, defendant Harry Walsh is Chief of Police of Jersey City, and defendant Board of Commissioners of Jersey City is the governing board of Jersey City. Defendant Frank Hague, as mayor, has general supervisory powers over all city departments and by his admission and in fact the policies of these departments, including the policies of the department of public safety, are his policies.

##### B. The Purposes of the Parties.

1. Plaintiffs, the Committee for Industrial Organization, Steel Workers Organizing Committee, United Electrical Radio and Machine Workers of America, and United Rubber Workers of America, were established and are maintained for the purpose of bringing about the organization as labor unions of unorganized workers in various industries and with the further purpose of causing said labor unions to exercise the normal and legal functions of labor organizations such as collective bargaining with respect to the betterment of wages, hours of work and other terms and conditions of employment.

2. Plaintiff American Civil Liberties Union was established and is maintained for the purpose of taking such measures as it deems lawful and essential for the enforcement of the rights secured by the First Amendment and the Fourteenth Amendment of the Constitution of the United States, U.S.C.A. The First Amendment reads as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

3. Defendants Frank Hague, Daniel J. Casey and Harry Walsh were elected or appointed and are in office for the purpose of taking part in the administration of the government of the City of Jersey City.

4. The purposes of the plaintiffs above set forth are in the letter and spirit of our Constitution and laws and of the theory of our democratic institutions.

5. There is no competent proof that the plaintiffs or any of them had any other purposes and more particularly there is no competent proof that the plaintiffs or any of them incited or advocated the overthrow of the government of the United States or the State of New Jersey by force of violence or incited or advocated the commission of any other acts in violation of the laws of the United States or the State of New Jersey.

### C. Liberty of the Person.

1. The defendants acting in their official capacities have adopted and enforced the deliberate policy (a) of excluding and removing from the limits of Jersey City various agents of the plaintiffs Committee for Industrial Organization and American Civil Liberties Union and various persons acting in sympathy or in concert with said plaintiffs, (b) of exercising personal restraint over various agents of the plaintiffs Committee for Industrial Organization and American Civil Liberties Union and various persons acting in sympathy or in concert with said plaintiffs and (c) of interfering with the right of locomotion on and the free access to public streets, highways, thoroughfares, parks and places of the City of Jersey City of various agents of the plaintiffs Committee for Industrial Organization and American Civil Liberties Union and various persons acting in sympathy or in concert with said plaintiffs.

2. This exclusion, removal, personal restraint and interference has been carried out by force and violence and without the consent of and contrary to the will of certain of the individual plaintiffs, various agents of the plaintiffs Committee for Industrial Organization and American Civil Liberties Union and various persons acting in sympathy or in concert with them, although all of those persons were at the time of such exclusion, removal, personal restraint and interference acting in an orderly and peaceable manner.

3. This exclusion, removal, personal restraint and interference of persons by force and violence is carried out by members of the police force of Jersey City on their own administrative fiat without authority of law and without bringing the persons, excluded, removed, personally restrained and interfered with as speedily as is reasonably possible before any judicial officer in order that such persons may be afforded a judicial hearing or day in court.

### D. Liberty of the Mind.

*Circulars, Leaflets and Handbills.*

1. The defendants, acting in their official capacities, have adopted and enforced the deliberate policy of preventing the plaintiffs and those acting in sympathy or in concert with them from distributing any circulars, leaflets or handbills and more particularly Plaintiffs' Exhibit No. 1 (handbill), No. 4 (leaflet), No. 7 (circular), and No. 32 (circular) in or about the streets, highways, thoroughfares or other public places of the City of Jersey City, and in so doing they have purported to rely on an ordinance of the City of Jersey City passed January 22, 1934.

2. This prevention is carried out by members of the police force of Jersey City by force and violence and without the consent of and contrary to the will of the plaintiffs and those acting in sympathy or in concert with them.

3. The circular, leaflets and handbills whose distribution was thus prevented were in no respect obscene, offensive to public morals or an advocacy of unlawful conduct (Lovell v. Griffin, 303 U.S. 444, at page 451, 58 S.Ct. 666, 82 L.Ed. 949) or in other respects objectionable.

4. The distribution of the circulars, leaflets, and handbills thus prevented is carried out in a manner consistent with the maintenance of public order and not involving disorderly conduct, the molestation of the inhabitants, or the misuse or littering of the streets. Lovell v. Griffin, 303 U.S. 444, at page 451, 58 S.Ct. 666, 82 L.Ed. 949.

5. There is competent proof that the defendants threatened to pursue the policy of preventing the distribution of circulars, leaflets and handbills by the plaintiffs and those acting in sympathy or in concert with them on the public streets, highways, thoroughfares and places of the City of Jersey City.

*Placards.*

1. The defendants, acting in their official capacities, have adopted and enforced the deliberate policy of preventing the plaintiffs and those acting in sympathy or in concert with them from distributing placards in or about the streets, highways, thoroughfares or other public places of the City of Jersey City, and in so doing they have purported to rely on an ordinance of the City of Jersey City adopted February 19, 1935.

2. This prevention is carried out by members of the police force of Jersey City by force and violence and without the consent of and contrary to the will of the plaintiffs and those acting in sympathy or in concert with them.

3. The placards whose distribution was thus prevented were in no respect obscene, offensive to public morals or an advocacy of unlawful conduct (Lovell v. Griffin, 303 U.S. 444, at page 451, 58 S.Ct. 666, 82 L. Ed. 949) or in other respects objectionable.

4. The distribution of the placards thus prevented is carried out in a manner consistent with the maintenance of public order and not involving disorderly conduct, the molestation of the inhabitants, or the misuse or littering of the streets. Lovell v. Griffin, 303 U.S. 444, at page 451, 58 S.Ct. 666, 82 L.Ed. 949.

5. There is competent proof that the defendants threatened to pursue the policy of preventing the distribution of placards by the plaintiffs and those acting in sympathy or in concert with them on the public streets, highways, thoroughfares and places of the City of Jersey City.

E. Public Meetings.

1. The defendants in their official capacities have adopted and enforced the deliberate policy of forbidding the plaintiffs and persons acting in sympathy or in concert with them, from communicating their views to the citizens of Jersey City through the holding of meetings or assemblies in the open air and at public places.

2. On or about December 17, 1937, plaintiff American Civil Liberties Union duly applied under and pursuant to the ordinance of the City of Jersey City adopted April 16, 1930, for a permit to hold an outdoor assembly in a public place in the City of Jersey City, to be addressed by Congressman Maverick, Congressman O'Connell, Congressman Allen and Morris L. Ernst; and on or about December 23, 1937, plaintiff Committee for Industrial Organization similarly applied for a permit to hold an outdoor assembly to be addressed by Congressman O'Connell, Roger N. Baldwin, William J. Carney, Al Barkin, Sam Macri and John Kiesler. Said applications were severally denied by defendant Daniel J. Casey upon consultation with and approval of the other defendants herein.

3. There is no competent proof that the parks of Jersey City or any of them are dedicated for purposes other than the general recreation of the public.

4. There is no competent proof that the proposed speakers or any of them at the meetings applied for by said plaintiffs referred to in Subdivision 2 of E hereof had ever spoken at any public meetings or assemblies in the open air and at public places previous to the applications for the permits above referred to.

5. A fortiori there is no competent proof that the proposed speakers or any of them at the meetings applied for by said plaintiffs referred to in Subdivision 2 of E hereof had ever spoken at any public meetings or assemblies in the open air and at public places previous to the applications of the permits above referred to at which said public meetings or assemblies any breach of the peace whatsoever had occurred.

6. A fortiori there is no competent proof that the proposed speakers or any of them at the meetings applied for by said plaintiffs referred to in Subdivision 2 of E hereof had ever spoken at any public meetings or assemblies in the open air and at public places previous to the applications for the permits above referred to at which said speakers or any of them had either in their choice of words or in their manner of uttering the words chosen violated the reasonable canons of decent discussion or given reasonable apprehension to believe that breaches of the peace would result from the utterance of the said words.

7. There is competent proof through Plaintiffs' Exhibits Nos. 10 and 11 that the City of Jersey City has granted permits to various persons other than the plaintiffs proposing to speak at meetings in the public streets of the said city.

F. Jurisdictional Allegations.

1. The rights of the plaintiffs and each of them, interfered with and frustrated by the defendants, above set forth, have a value as to each plaintiff in the excess of the sum of $3000, exclusive of interest and costs.

2. The enforcement of the defendants' policies above set forth, as against the plaintiffs herein, results in irreparable damage to them and the threat of continued enforcement of said policies against them involves a threat of manifold and repeated prosecutions for alleged offenses and manifold and repeated invasions of their rights.

3. There is no competent proof that the plaintiffs Committee for Industrial Organization and American Civil Liberties Union are such organizations or that the individual plaintiffs have so conducted themselves as to forfeit the protection of a court of equity.

Conclusions of Law.

1. The Court has jurisdiction over this suit under Section 24(1) of the Judicial Code, 28 U.S.C.A. § 41(1), and under Section 24(14) of the Judicial Code, 28 U.S.C.A. § 41(14), and under Section 24(12)

and (14) of the Judicial Code, 28 U.S.C.A. § 41(12) and (14).·

2. The defendants' official policy and acts respecting exclusion, removal and personal restraint are in violation of Section 1, and the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, U.S.C.A., and the interstate commerce clause of Article 1, Section 8 of the Constitution of the United States, U.S.C.A.

3. The defendants' official policy and acts respecting interference, free access to, locomotion and communication of thoughts on the public streets, highways, thoroughfares, parks and places of the City of Jersey City are in violation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States.

4. The defendants' official policy and acts respecting distribution of literature on the public streets, highways, thoroughfares, parks and places are in violation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, and the ordinance of the City of Jersey City, passed January 22, 1924, under which the defendants have purported to act, is, with respect to such distribution of literature, held to be void, unconstitutional and of no force or effect.

5. The defendants' official policy and acts respecting placards are in violation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, and the ordinance of the City of Jersey City adopted February 19, 1935, under which the defendants have purported to act, is held to be void, unconstitutional and of no. force or effect.

6. The defendants' official policy· and acts respecting public assemblies are in violation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, and the ordinance of the City of Jersey City, adopted April 15, 1930, under which the defendants have purported to act, is in its application void, unconstitutional and of no force or effect.

7. The plaintiffs herein have established and proved a cause of action under the Constitution of the United States, and under Section 43 of Title 8 of the United States Code, 8 U.S.C.A. § 43, and under Section 47(3) of Title 8 of the United States Code, 8 U.S.C.A. § 47(3), reinforced by Section 51 of Title 18 of the United States Code, 18 U.S.C.A. § 51.

8. The separate and distinct defense in point of law set forth in the defendants' answer herein, to the effect that certain of the defendants were ·improperly joined as individuals, is held to be insufficient in law upon the face thereof.

9. The allegations contained in the second paragraph added to the defendants' answer by their amendment to answer are held not to constitute a valid defense and to be insufficient in law as a defense upon the face thereof.

10. The plaintiffs have no adequate remedy at law, and have established a cause of action entitling them to relief in this court of equity, and are not debarred from such relief by any acts heretofore performed by them, and do not come into this court of equity with unclean hands.

11. The plaintiffs are entitled to a permanent injunction against defendants in terms and form as in the subjoined judgment and decree.

Final Judgment and Decree of the Trial Court.

It is on this 7th day of November, 1938, Ordered, Decreed and Adjudged as follows:

The defendants Frank Hague individually and as Mayor of Jersey City, Daniel J. Casey, individually and as Director of Public Safety of Jersey City, Harry Walsh, individually and as Chief of Police of Jersey City, the Board of Commissioners of Jersey City, and the agents, servants, employees, deputies, and officers of the defendants and each of them, and all persons associated with or under the direction, supervision or control of the defendants or any of them are hereby perpetually enjoined and restrained:

A. Liberty of the Person.

1. From directly or indirectly excluding or removing the plaintiffs or any of them, or the agents, servants or employees of, or persons acting in sympathy or in concert with the plaintiffs or any of them from the City of Jersey City.

2. From directly or indirectly exercising any personal restraint over the plaintiffs or any of them, or the agents, servants or employees of, or persons acting in sympathy or in concert with the plaintiffs or any of them except in so far as such personal re-

straint is in accordance with any right of search and seizure and any right of arrest and removal as speedily as is reasonably possible before a judicial officer under existing law.

3. From directly or indirectly interfering with the plaintiffs or any of them, or the agents, servants or employees of, or persons acting in sympathy or in concert with the plaintiffs or any of them in their right of free access to and locomotion on the public streets, highways, thoroughfares, parks and places of the City of Jersey City except in so far as such interference is in accordance with any right of search and seizure and any right of arrest and removal as speedily as is reasonably possible before a judicial officer under existing law.

## B. Liberty of the Mind.

1. Speaking other than at public meetings.

From directly or indirectly interfering with the plaintiffs or any of them, or the agents, servants or employees of, or persons acting in sympathy or in concert with the plaintiffs or any of them in their right to communicate their thoughts to other persons in and about the public streets, highways, thoroughfares, parks and places of the City of Jersey City except in so far as such interference is in accordance with any right of search and seizure and any right of arrest and removal as speedily as is reasonably possible before a judicial officer under existing law and except further this paragraph has no bearing upon the right of the plaintiffs or any of them, or the agents, servants or employees of, or persons acting in sympathy or in concert with the plaintiffs or any of them to speak at public meetings which right is hereinafter dealt with.

2. Circulars, leaflets and handbills.

From interfering directly or indirectly with the plaintiffs or any of them, or the agents, servants, or employees of, or persons acting in sympathy or in concert with the plaintiffs or any of them, in the circulation or distribution by them to persons on the public streets, highways, thoroughfares, parks and places of the City of Jersey City of pamphlets, circulars, handbills, emblems or any written or printed matter whatsoever; provided that (1) the said circulars, leaflets and handbills are in no respect obscene, offensive to public morals or an advocacy of unlawful conduct (Lovell v. Griffin, 303 U.S. 444, at page 451, 58 S.Ct. 666, 82 L.Ed. 949), and provided (2) that the distribution of the said circulars, leaflets and handbills is carried out in a manner consistent with the maintenance of public order and not involving disorderly conduct, the molestation of the inhabitants, or the misuse or littering of the streets. Lovell v. Griffin, 303 U.S. 444, at page 451, 58 S.Ct. 666, 82 L.Ed. 949.

3. Placards.

From interfering directly or indirectly with the plaintiffs or any of them, or the agents, servants or employees of, or persons acting in sympathy or in concert with the plaintiffs or any of them, in the carrying of, or the display by them to persons on the public streets, highways, thoroughfares, parks and places of the City of Jersey City, of placards, signs or any written or printed matter whatsoever, whether by walking to and fro with such written or printed matter affixed to their persons, or held in the hands, or otherwise; provided that (1) the said placards, signs or any written or printed matter whatsoever are in no respect obscene, offensive to public morals or an advocacy of unlawful conduct (Lovell v. Griffin, 303 U.S. 444, at page 451, 58 S.Ct. 666, 82 L.Ed. 949) and provided (2) that the distribution of the said placards, signs or any written or printed matter whatsoever is carried out in a manner consistent with the maintenance of public order and not involving disorderly conduct, the molestation of the inhabitants, or the misuse or littering of the streets. Lovell v. Griffin, 303 U.S. 444, at page 451, 58 S.Ct. 666, 82 L.Ed. 949.

4. Public Meetings.

(a) From placing any previous restraint upon or in any other manner whatsoever directly or indirectly interfering with the plaintiffs or any of them in respect to the holding of meetings or assemblies in the open air and in parks dedicated for the purposes of the general recreation of the public provided that an application for a permit to hold such meetings by or on behalf of said plaintiffs or any of them has been made three days in advance of such meetings and provided further that such permit may be refused these plaintiffs or any of them only for the reason that the particular time or place designated in the application is in reasonable conflict with the public recreational purposes of said parks.

(b) From refusing to or withholding from the said plaintiffs or any of them applications for said permits as hereinabove provided such protection at said meetings

or assemblies as is necessary to secure to said plaintiffs or any of them the opportunity to hold such meetings without interference from or interruption by such persons as may be present at said meetings provided only that such protection is reasonably consistent with the ability of the defendants to carry out their obligations in regard to the safety of the residents of Jersey City and provided further that the duty of the defendants to afford such protection to the holding of such meetings or assemblies as may be necessary for their peaceful continuance may be terminated by words or conduct of the plaintiffs or any of them in violation of existing law.

(c) From continuing their heretofore expressed refusal to grant permission to Congressman Maverick, Congressman O'Connell, Congressman Allen and Morris L. Ernst, and Congressman O'Connell, Roger N. Baldwin, William J. Carney, Al Barkin, Sam Macri and John Kiesler upon applications dated December 17 and 23, 1937, respectively, and from continuation their heretofore expressed refusal to grant those said named speakers all the rights set forth in the preceding two paragraphs of this decree for injunction.

(d) From refusing to the plaintiffs or any of them the rights set forth in the three preceding paragraphs of this decree for injunction in so far as such rights may be sought with respect to public meetings on any of the public streets, highways, thoroughfares or places of the City of Jersey City (other than public parks) and unless and until the defendants acted in their official capacities adopt and enforce the deliberate policy of forbidding meetings of any kind on any of the public streets, highways, thoroughfares or places of the City of Jersey City provided that the rights of the plaintiffs or any of them to hold meetings on the public streets, highways, thoroughfares or places of the City of Jersey City be held subject to a reasonable interpretation by the defendants of the acknowledged easement of public passage over any of the said public streets, highways, thoroughfares or places of the City of Jersey City.

5. Formal.

From ordering, commanding, directing, assisting, aiding or abetting in any manner whatsoever any person to commit or attempt to commit any of the things enjoined by this decree, or not to do anything required by this decree to be done.

Ordinances.

An Ordinance to regulate the distribution of newspapers, papers, periodicals, books, magazines, circulars, cards and pamphlets.

The Board of Commissioners of the Mayor and Aldermen of Jersey City do ordain:

1. No person shall distribute or cause to be distributed or strewn about any street or public place any newspapers, paper, periodical, book, magazine, circular, card or pamphlet.

2. No person shall distribute or cause to be distributed to the occupants of any house, place or cause to be placed into any areaway, in front of, or along the side of any house, or upon the doorstep thereof any newspaper, paper, periodical, book, magazine, circular, card or pamphlet, unless the same has been previously ordered by the person in actual occupation of the house, in the areaway of which, in front of which, or along the side or doorstep of which said newspaper, paper, periodical, book, magazine, circular, card or pamphlet shall be distributed or placed.

3. Any person violating or causing to be violated, or consenting to, or permitting the violation of any of the provisions of this ordinance shall, upon conviction thereof, be liable or subject to a fine of not exceeding Ten ($10.00) Dollars, or imprisonment for a period of not exceeding ten (10) days in the city prison or the county jail, in accordance with the statutes in such cases made and provided, or both, for the first offense, and a fine of Twenty-five ($25.00) Dollars or imprisonment not exceeding thirty (30) days, or both, for each and every subsequent offense.

4. Any complaint regarding the violation of any of the provisions of this ordinance shall be cognizable before the Police Courts of this City.

5. This ordinance shall take effect immediately.

Michael I. Fagen,
Wm. B. Quinn,
John Saul,
A. Harry Moore,
Frank Hague,
Commissioners.

Passed: January 22, 1924.
Edward J. Holland,
City Clerk.

An Ordinance to preserve public peace and good order, and to prevent riots, disturbances and disorderly assemblage.

The Board of Commissioners of Jersey City Do Ordain:

1. From and after the passage of this ordinance, no public parades or public assembly in or upon the public streets, highways, public parks or public buildings of Jersey City shall take place or be conducted until a permit shall be obtained from the Director of Public Safety.

2. The Director of Public Safety is hereby authorized and empowered to grant permits for parades and public assembly, upon application made to him at least three days prior to the proposed parade or public assembly.

3. The Director of Public Safety is hereby authorized to refuse to issue said permit when, after investigation of all of the facts and circumstances pertinent to said application, he believes it to be proper to refuse the issuance thereof; provided, however, that said permit shall only be refused for the purpose of preventing riots, disturbances or disorderly assemblage.

4. Any person or persons violating any of the provisions of this ordinance shall upon conviction before a police magistrate of the City of Jersey City be punished by a fine not exceeding two hundred dollars or imprisonment in the Hudson County jail for a period not exceeding ninety days or both.

5. This ordinance shall take effect upon its final passage.

Introduced April 1st, 1930
Adopted April 15th, 1930

 John Beggans
 Michael I. Fagen
 Arthur Potterton
 William B. Quinn
 Frank Hague
 Commissioners

Dated, City Clerk's Office
Jersey City, April 21st, 1930
Edward J. Holland, City Clerk.

DAVIS, Circuit Judge (dissenting in part).

It is with regret that I feel constrained to dissent in part from the conclusions of my colleagues.

The first conclusion from which I dissent is that of the question presented by this appeal. They say that it is "whether or not certain fundamental civil liberties safeguarded by the Constitution of the United States shall be observed and protected in Jersey City or shall there stand abridged". This statement "begs the question". It assumes that what the defendants, speaking of the parties as they stood in the District Court, did in Jersey City constituted an abridgment of these "fundamental civil liberties" and the only question would then be whether or not they should stand abridged in Jersey City and not elsewhere. The mere statement of that question answers itself. The question, as I see it, is whether or not what the defendants did in Jersey City deprived the plaintiffs of any rights to which they were entitled under the Constitution of the United States. The answer to this question depends upon two further questions.

The first one is whether or not the ordinance, pursuant to which the permits were denied, is constitutional and if it is, the second question is whether or not the Director of Public Safety in denying the permits abused the discretion and authority which the ordinance vests in him.

The decree is divided into two parts: A., "Liberty of the Person", and B., "Liberty of the Mind". The substance of the restraints contained in the decree follows:

Under A., the Court enjoined the defendants:

1. From excluding or removing the plaintiffs, which includes in this decree, their agents, servants, employees and persons acting in sympathy and concert with them, from Jersey City;

2. From exercising any personal restraint over the plaintiffs except so far as such restraint is in accordance with any right of search and seizure and any right of arrest and removal as speedily as is reasonably possible before a judicial officer under existing law, and

3. From interfering with plaintiffs in their right of free access to and locomotion on the public streets, highways, thoroughfares, parks and places of Jersey City except in so far as such interference is in accordance with any right of search and seizure, etc. as stated in No. "2" above.

There is no serious objection, as I understand it, to this part of the decree if it is construed not to interfere with what is generally accepted everywhere as legitimate work of police officers and detectives.

Under B., the court enjoined the defendants:

1. From interfering with the plaintiffs in their right to communicate their thoughts to other persons in and about the public streets, highways, thoroughfares, parks and

places of Jersey City except in so far as such interference is in accordance with any right of search and seizure, etc. as stated above, except that this paragraph has no bearing upon the right of the plaintiffs to speak at public meetings;

2. From interfering with the plaintiffs in the circulation or distribution by them in the public streets, etc. of Jersey City of pamphlets, circulars, handbills, or any written or printed matter whatsoever; provided that the circulars, pamphlets, etc., are in no respect "obscene, offense to pubic morals or an advocacy of unlawful conduct" and "that their distribution is carried out in a manner consistent with the maintenance of public order and not involving disorderly conduct, the molestation of the inhabitants or the misuse or littering of the streets * * *";

3. From interfering with the plaintiffs in carrying or displaying on the public streets, etc., of Jersey City placards, signs or any written or printed matter whatsoever; provided such matter is not obscene or against public morals and that the carrying of the placards is orderly and without molestation to the inhabitants of Jersey City and without littering the streets, etc.

The decree is in these three respects, under "B.", proper and there is no real objection so far to it. The learned trial judge devoted only a small part of his opinion to the decree up to this point. The real contest in this case is concerned with B. 4. (a), (b), (c) and (d) in which the court enjoined the defendants as follows:

"4. Public Meetings:

"(a) From placing any previous restraint upon or in any other manner whatsoever directly or indirectly interfering with the plaintiffs or any of them in respect to the holding of meetings or assemblies in the open air and in parks dedicated for the purposes of the general recreation of the public provided that an application for a permit to hold such meetings by or on behalf of said plaintiffs or any of them has been made three days in advance of such meetings and provided further that such permit may be refused these plaintiffs or any of them only for the reason that the particular time or place designated in the application is in reasonable conflict with the public recreational purposes of said parks.

"(b) From refusing to or withholding from the said plaintiffs or any of them applications for said permits as hereinabove provided such protection at said meetings or assemblies as is necessary to secure to said plaintiffs or any of them the opportunity to hold such meetings without interference from or interruption by such persons as may be present at said meetings provided only that such protection is reasonably consistent with the ability of the defendants to carry out their obligations in regard to the safety of the residents of Jersey City and provided further that the duty of the defendants to afford such protection to the holding of such meetings or assemblies as may be necessary for their peaceful continuance may be terminated by words or conduct of the plaintiffs or any of them in violation of existing law.

"(c) From continuing their heretofore expressed refusal to grant permits to Congressman Maverick, Congressman O'Connell, Congressman Allen and Morris L. Ernst, and Congressman O'Connell, Roger N. Baldwin, William J. Carney, Al Barkin, Sam Macri and John Kiesler upon applications dated December 17 and 23, 1937, respectively, and from continuation of their heretofore expressed refusal to grant those said named speakers all the rights set forth in the preceding two paragraphs of this decree for injunction.

"(d) From refusing to the plaintiffs or any of them the rights set forth in the three preceding paragraphs of this decree for injunction in so far as such rights may be sought with respect to public meetings on any of the public streets, highways, thoroughfares or places of the City of Jersey City (other than public parks) and unless and until the defendants acting in their official capacities adopt and enforce the deliberate policy of forbidding meetings of any kind on any of the public streets, highways, thoroughfares or places of the City of Jersey City provided that the rights of the plaintiffs or any of them to hold meetings on the public streets, highways, thoroughfares or places of the City of Jersey City be held subject to a reasonable interpretation by the defendants of the acknowledged easement of public passage over any of the said public streets, highways, thoroughfares or places of the City of Jersey City."

The ordinance[5] and the so-called "Home Rule" statute of New Jersey, R.S. N.J.1937, 40:42–1 et seq., pursuant to which the ordinance was passed, are grounded upon the assumption that the streets and parks of Jersey City belong exclusively to the state and it or the city, in so far as it has been authorized by the state to do so, may say whether or not parades or public meetings may be held on the streets or in the parks and under what conditions. That Jersey City has such authority has been settled in the courts of New Jersey, of Massachusetts, of Pennsylvania, of Illinois and of other states, and in the federal courts.

In Inhabitants of City of Burlington v. Pennsylvania R. Co., 56 N.J.Eq. 259, 261, 38 A. 849, 850, the court said:

"It is, of course, true that the public rights, so far as it is concerned, is subject to the legislative control over streets. As to the public, the legislature can authorize the abandonment of a street in toto, or turn it in part over to a private enterprise. It may therefore legalize the operation of a steam railroad transversely or longitudinally over or along a highway. The legislative authority, however, must appear, either in express terms, or must flow as a necessary implication from powers expressly granted. State v. Warren Railroad Co., 29 N.J.L. 353 [5 Dutch. 353]; Newark v. Delaware, Lackawanna and Western Railroad Co., 42 N.J.Eq. 196 [15 Stew. 196], 7 A. 123; Hoboken Land & Improvement Co. v. Hoboken, 35 N.J. L. 205 [6 Vroom 205]. The grant of power may be made directly by the legislature, or it may be delegated to the government of a municipality. It may be contained in the charter of a city, in the charter of a railroad, or· in a general statute."

In Harwood v. Trembly, 97 N.J.L. 173, 175, 116 A. 430, 431, Chief Justice Gummere declared the law as follows:

"The streets of a city are common highways, primarily designed for the use of the public in passing and repassing and in such temporary occupancy as is incidental to the exercise of those rights. No one is justified in obstructing a public street by collecting therein a large assemblage of people for the purpose of delivering an address to them. The common highways of the state are not designed for the purpose of holding public meetings therein, and any one who attempts to do this, without having first obtained permission from the public authorities in charge of such highways commits a public nuisance. The constitutional guaranty of liberty of speech no more authorizes a citizen to appropriate to his own use the public property of a community for the purpose of exercising that guaranty than it permits him to occupy in invitum the private property of a fellow citizen for the same purpose. In order to protect the public in the full enjoyment of the city streets, the municipal authorities are clothed with the power of seeing that such enjoyment is not unnecessarily interfered with, and, in the exercise of that power, to take all.reasonable steps to prevent such interferences."

In the case of Thomas v. Casey, 121 N.J.L. 185, 1 A.2d 866, 870, Mr. Justice Bodine, in an able and well-reasoned opinion said:

"He [Thomas] has no more right to speak in public places in that city, such as highways and parks, without permit than he has to invade a citizen's home without invitation."

In Commonwealth v. Davis, 162 Mass. 510, 39 N.E. 113, 26 L.R.A. 712, 44 Am. St.Rep. 389, in which Davis spoke on the

---

5 "1. From and after the passage of this ordinance, no public parades or public assembly in or upon the public streets, highways, public parks or public buildings of Jersey City shall take place or be conducted until a permit shall be obtained from the Director of Public Safety.

"2. The Director of Public Safety is hereby authorized and empowered to grant permits for parades and public assembly, upon application made to him at least three days prior to the proposed parade or public assembly.

"3. The Director of Public Safety is hereby authorized to refuse to issue said permit when, after investigation of all of the facts and circumstances pertinent to said application, he believes it to be proper to refuse the issuance thereof; provided, however, that said permit shall only be refused for the purpose of preventing riots, disturbances or disorderly assemblage.

"4. Any person or persons violating any of the provisions of this ordinance shall upon conviction before a police magistrate of the City of Jersey City be punished by a fine not exceeding two hundred dollars or imprisonment in the Hudson County Jail for a period not exceeding ninety days or both."

Boston Common without a permit in violation of a city ordinance, Mr. Justice Holmes said:

"There is no evidence before us to show that the power of the legislature over the common is less than its power over any other park dedicated to the use of the public, or over public streets, the legal title to which is in a city or town. Lincoln v. Boston, 148 Mass. 578, 580, 20 N.E. 329 [3 L.R.A. 257, 12 Am.St.Rep. 601]. As representative of the public, it may and does exercise control over the use which the public may make of such places, and it may and does delegate more or less of such control to the city or town immediately concerned. For the legislature absolutely or conditionally to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house."

In reviewing that case (Davis v. Massachusetts, 167 U.S. 43, 17 S.Ct. 731, 733, 42 L.Ed. 71) hereinafter called the Davis case, on appeal to the Supreme Court of the United States, Mr. Justice White affirmed the Massachusetts court as follows:

"It is therefore conclusively determined that there was no right in the plaintiff in error to use the common except in such mode and subject to such regulations as the legislature, in its wisdom, may have deemed proper to prescribe. The fourteenth amendment to the constitution of the United States [U.S.C.A.] does not destroy the power of the states to enact police regulations as to the subjects within their control (Barbier v. Connolly, 113 U.S. 27, 31, 5 S.Ct. 357 [28 L.Ed. 923]; Minneapolis & St. Louis Railway Co. v. Beckwith, 129 U.S. 26, 29, 9 S.Ct. 207 [32 L.Ed. 585]; Giozza v. Tiernan, 148 U.S. 657, 13 S.Ct. 721 [37 L.Ed. 599]; Jones v. Brim, 165 U.S. [180], 182, 17 S.Ct. 282 [41 L.Ed. 677]), and does not have the effect of creating a particular and personal right in the citizen to use public property in defiance of the constitution and laws of the state.

\* \* \* \* \* \*

"The right to absolutely exclude all right to use necessarily includes the authority to determine under what circumstances such use may be availed of, as the greater power contains the lesser. The finding of the court of last resort of the state of Massachusetts, being that no par-

ticular right was possessed by the plaintiff in error to the use of the common, is in reason, therefore, conclusive of the controversy which the record presents, entirely aside from the fact that the power conferred upon the chief executive officer of the city of Boston by the ordinance in question may be fairly claimed to be a mere administrative function vested in the mayor in order to effectuate the purpose for which the common was maintained and by which its use was regulated."

This case has been followed in many inferior federal courts. Mutual Film Co. v. Industrial Commission of Ohio, D.C., 215 F. 138; Lutz v. City of New Orleans, D.C., 235 F. 978; Community Chautauquas v. Caverly, D.C., 244 F. 893; Lane v. Whitaker, D.C., 275 F. 476; Buck v. Kuykendall, D.C., 295 F. 197; Capital Taxicab Co. v. Cermak, D.C., 60 F.2d 608; Sullivan v. Shaw, D.C., 6 F.Supp. 112.

The specific point here presented was absolutely settled in the Davis case and if the law there declared is still the law, it is conclusive of the issues here involved and the District Court and this court have overruled the Supreme Court. This they both seek to avoid in two ways:

They say that the case at bar can be distinguished from the Davis case and that in any event the Supreme Court in later cases has "modified" the law there announced.

They seek to distinguish this case from the Davis case by the fact that in that case no application was made for a permit, but in this case there was. This is a "distinction without a difference". The Supreme Court thought so little of the fact that no application was made in the Davis case that it did not even mention that fact, but discussed the questions on their merits and declared the law. If the ordinance in the Davis case was void, it was void on its face and Davis with or without an application was entitled to test its validity, Lovell v. Griffin, 303 U.S. 444, 552, 58 S.Ct. 666, 82 L.Ed. 949, and this he did.

The attempted distinction does not avoid the difficulty which this court had in trying to get around the Davis case and so it says that the law declared in that case has been "modified" in later decisions of the Supreme Court. The majority opinion shows that by "modified" is meant changed, overruled. The opinion in the Davis case was delivered more

than forty years ago and no other court has found that the law has been "modified" or in any way changed, but every court, state and federal, which has considered the identical question sub judice has relied upon that case for the law there announced.

This court says that the Davis case has been "modified" by the cases of Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138; Fiske v. Kansas, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108; De Jonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278; Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357; Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949. A case is "modified", changed or overruled expressly or by necessary implication.

There is not a line, word or even a hint, in those cases expressly modifying, changing or overruling the Davis case and I do not think that they have done so by necessary implication.

To repeal a statute or overrule a decision by implication is an unpopular doctrine and it is not usually done. The recent references to the Davis case by the Supreme Court indicate that the law as there laid down still stands and has not been "modified". Packard v. Banton, 264 U.S. 140, 145, 44 S.Ct. 257, 68 L.Ed. 596; Chicago Title & Trust Co. v. Wilcox Building Corporation, 302 U.S. 120, 128, 58 S.Ct. 125, 82 L.Ed. 147. It is true that the issue in these cases was not abridgment of the freedom of speech, but the Davis case was cited as authority for the law they were declaring without a hint or an implication that the doctrine of that case had been "modified".

In the Gitlow case, Gitlow was indicted, tried and convicted for criminal anarchy which advocates the doctrine that organized government should be overthrown by force or violence, or by assassination of the executive head or executive officials thereof. The defendant contended that the statute against criminal anarchy was in contravention of the due process clause of the Fourteenth Amendment. The Supreme Court affirmed the judgment and in its opinion said:

"That utterances inciting to the overthrow of organized government by unlawful means, present a sufficient danger of substantive evil to bring their punishment within the range of legislative discretion, is clear. Such utterances, by their very nature, involve danger to the public peace and to the security of the State. They threaten breaches of the peace and ultimate revolution. And the immediate danger is none the less real and substantial, because the effect of a given utterance cannot be accurately foreseen. The State cannot reasonably be required to measure the danger from every such utterance in the nice balance of a jeweler's scale. A single revolutionary spark may kindle a fire that, smouldering for a time, may burst into a sweeping and destructive conflagration. It cannot be said that the State is acting arbitrarily or unreasonably when in the exercise of its judgment as to the measures necessary to protect the public peace and safety, it seeks to extinguish the spark without waiting until it has enkindled the flame or blazed into the conflagration. It cannot reasonably be required to defer the adoption of measures for its own peace and safety until the revolutionary utterances lead to actual disturbances of the public peace or imminent and immediate danger of its own destruction; but it may, in the exercise of its judgment, suppress the threatened danger in its incipiency. In People v. Lloyd, supra, [304 Ill. 23], p. 35 (136 N.E. [505], 512), it was aptly said: 'Manifestly, the legislature has authority to forbid the advocacy of a doctrine designed and intended to overthrow the government without waiting until there is a present and imminent danger of the success of the plan advocated. If the State were compelled to wait until the apprehended danger became certain, then its right to protect itself would come into being simultaneously with the overthrow of the government, when there would be neither prosecuting officers nor courts for the enforcement of the law.'

"We cannot hold that the present statute is an arbitrary or unreasonable exercise of the police power of the State unwarrantably infringing the freedom of speech or press; and we must and do sustain its constitutionality." [268 U.S. 652, 45 S.Ct. 631].

The judgment of conviction was affirmed and instead of modifying the law of the Davis case, this case rather affirms it.

Fiske v. Kansas, 274 U.S. 380, 387, 47 S.Ct. 655, 657, 71 L.Ed. 1108, was a case in which Fiske was indicted, tried, convicted and sentenced for violating the stat-

ute of Kansas against Criminal Syndicalism which is defined as the doctrine that advocates crime, physical violence, arson, destruction of property, sabotage, or other unlawful acts or methods as a means of effecting industrial or political ends, or as a means of effecting political revolution.

All that was proved against Fiske was that he solicited and secured members in an organization which it was charged violated the Criminal Syndicalism Act, Laws Kan.1920, Sp.Sess., c. 37. The court said:

"The result is that the Syndicalism Act has been applied in this case to sustain the conviction of the defendant, without any charge or evidence that the organization in which he secured members advocated any crime, violence or other unlawful acts or methods as a means of effecting industrial or political changes or revolution. Thus applied the Act is an arbitrary and unreasonable exercise of the police power of the State, unwarrantably infringing the liberty of the defendant in violation of the due process clause of the Fourteenth Amendment. [U.S.C.A Const.]."

In other words, Fiske was convicted without any evidence whatever to establish the crime of which he was charged and convicted. It was held that this violated the due process clause of the Fourteenth Amendment.

Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 626, 75 L.Ed. 1357, involved a suit to suppress a newspaper for criticising certain public officials for the alleged prevalence and protection of crime, on the ground that the criticism was "malicious, scandalous and defamatory". The court held that under the circumstances of that case previous restraint of publications, was an infringement of the liberty of the press guaranteed by the Fourteenth Amendment, but the libeler remained civilly and criminally responsible for his libel.

In the case of De Jonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 260, 81 L.Ed. 278, DeJonge was indicted, tried and convicted for violating the Criminal Syndicalism Law of Oregon for assisting in the conduct of a meeting which was called "under the auspices of the Communist Party, an organization advocating criminal syndicalism."

At the trial DeJonge moved for the direction of acquittal on the ground that the statute as applied to him for merely assisting at a meeting of the Communist Party at which nothing unlawful was done or advocated, violated the due process clause of the Fourteenth Amendment. The motion was denied and he was convicted.

The offense for which DeJonge was convicted and sentenced to imprisonment for seven years was assisting in the conduct of a meeting which was orderly and in which no unlawful act was advocated or committed. His apparent, sole offense was that he took part in a meeting held under the auspices of the Communist Party.

On appeal, the Supreme Court said:

"It follows from these considerations that, consistently with the Federal Constitution, peaceable assembly for lawful discussion cannot be made a crime. The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score. The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects."

In Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 669, 82 L.Ed. 949, Alma Lovell was convicted in the Recorder's Court of the City of Griffin, Georgia, and was sentenced to imprisonment for fifty days in default of the payment of a fine of fifty dollars for distributing a pamphlet and magazine in the nature of religious tracts without securing a permit, in violation of a city ordinance which provided that the distribution of circulars, handbooks, advertising, or any other kind of literature without first obtaining written permission from the City Manager was a nuisance and punishable as an offense against the City. The Superior Court of the County refused a review and the Supreme Court of Georgia denied an application for certiorari.

There was no restriction in the application of the ordinance with respect to time and place. "It is not limited to ways which might be regarded as inconsistent with the maintenance of public order, or as involving disorderly conduct, the molestation of the inhabitants, or the misuse or littering of the streets." The court held that, "Whatever the motive which induced its adoption, its character is such

that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship".

The cases of Near v. Minnesota, supra, De Jonge v. Oregon, supra, and Lovell v. Griffin, supra, more nearly resemble the case at bar than any of the others. The contentions made in them were direct challenges .to the rights safeguarded and guaranteed by the Fourteenth Amendment and the conclusions reached by the Supreme Court were inevitable. The Minnesota case was a plain attempt to suppress a newspaper because it criticised public officers for alleged protection of corruption. The De Jonge case was nothing more than an attempt to punish a citizen by imprisonment for seven years for assisting in the conduct of a peaceful, orderly and lawful meeting held under the auspices of the Communist Party. The Lovell case was an attempt to punish a person for distributing religious tracts which set forth the tenets of her faith.

These cases and the statutes or ordinances, under which they *were brought are a long way from the case at bar. The ordinance here under consideration was passed for self protection and self preservation. As Mr. Justice Sanford, quoting from the case of Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205, said in the Gitlow case, "the State is primarily the judge of regulations required in the interest of public safety and welfare". The passage of the ordinance by Jersey City was state action, Lovell v. Griffin, supra, and its adoption was the promulgation of regulations which the state of New Jersey judged to be required in the interest of the public safety and welfare of its people. It was adopted for the express purpose of preventing riots, disturbances and disorderly assemblage and this the city and state had the right to do. The right of self-preservation is an inherent function of government. "In maintaining this guaranty [of the fundamental rights of person and property] the authority of the State to enact laws to promote the health, safety, morals, and general welfare of its people is necessarily admitted." Near v. Minnesota, supra. Any interference with freedom of speech or of the press was incidental. As Chief Justice Hughes said in the De Jonge case, if the rights of free speech and peaceable assembly are to be preserved, the question is not as to the auspices under which a meeting is held,

but as to its purpose. No case has been cited holding that an ordinance passed for the safety, protection and welfare of a city, when properly administered, is unconstitutional. The cases upon which the majority opinion rests for a modification of the law declared in the Davis case, do not even mention that case. In the De Jonge case, the Chief Justice said: "None of our decisions go to the length of sustaining such a curtailment of the right of free speech and assembly as the Oregon statute demands in its present application". The decision in the Davis case must be included in "our decisions" mentioned in the De Jonge case. Accordingly when the Jersey City ordinance is properly applied, it does not curtail the right of free speech and free assembly within the meaning of the Constitution of the United States and the decisions of the Supreme Court

The next question is whether or not the Director of Public Safety of Jersey City abused the authority vested in him by the ordinance in denying permits to the plaintiffs. In order to determine this question it is necessary to know and consider at least some of the facts and circumstances surrounding his refusal. Of course, he must fairly investigate all the facts and circumstances pertinent to an application and must honestly "believe it to be proper to refuse the issuance" of a permit "for the purpose of preventing riots, disturbances or disorderly assemblage" or some of them. The facts and circumstances must be sufficient to enable a reasonable man to come to that belief before he may refuse.

The plaintiffs informed the Director that Roger N. Baldwin, among others, was to speak at the meeting for which they sought a permit. Their application had been given wide publicity and a great deal of agitation and excitement had arisen over this and the proposed "invasion" of Jersey City by the plaintiffs and others who were associated with them. Thereupon the following letter was written to the Director:

"Committee of Veterans of Jersey City

"921 Bergen Avenue,

"Jersey City, N. J. December 27, 1937

"Hon. Daniel Casey, Department of Public Safety, Jersey City, N. J.

"Dear Commissioner: We understand from the newspapers that there is pending

before you now an application for a permit to hold an open air public meeting in this City.

"Among the speakers listed for the meeting is one Roger N. Baldwin, whose record was published in this afternoon's newspapers. In that record we find a conviction by a United States Court for draft dodging and a prison sentence of one year in the Essex County Penitentiary. We consider any man convicted of this crime to be thoroughly Un-American in his principles and unworthy of receiving any consideration at the hands of the City Officials, at least to the extent of granting him permission to speak in this City at a public meeting.

"We hereby protest against the granting of the permit to Roger N. Baldwin, or to any members of the Un-American group he represents, irrespective of what they claim to be the purpose of their meeting. We demand that you withhold action on this application.

"The reason for requesting delay is that we wish to assemble in a body at the Jersey City Armory on Tuesday, tomorrow evening, in order that we may prepare and have adopted by the full membership of all the Veterans' Organizations in Jersey City, resolutions of protest against allowing this 'slacker' or any of his type, to appear publicly in Jersey City, whose citizens are devoted to American principles and the upholding of our American Constitution.

"Please give us a prompt answer to this letter.

 "Very truly yours,
 "Charles A. Peterson
 "Past State Commander V. F. W.
 "William E. Malinka
 "American Legion
 "George A. Reilly
 "Adjutant, Jersey City Post A. L.
 "Davis N. Nimmo
 "Past Commander, Hudson County, Amer. Legion
 "Louis F. J. Borgers
 "Commander, Quinn Post, American Legion
 "Hugh A. Kelly
 "Commander, Jersey City Post, Amer. Legion."

More than three thousand veterans of Jersey City met the next day, December 28, 1937, and passed a resolution which they sent to the Director. Among those present were representatives of the American Legion, Veterans of Foreign Wars, Catholic War Veterans, Jewish War Veterans, Irish War Veterans, Polish American War Veterans, Italian War Veterans, Disabled War Veterans, Reserve Officers Association, Marine Corps League, Veterans of Three Wars, United Spanish American War Veterans.

The resolution reads in part as follows:

"Whereas, in his testimony before the Fish Congressional Committee he (Roger N. Baldwin) did testify that force, violence and murder may be resorted to for the overthrow of government, his testimony being as follows:

"The Chairman: Does your organization uphold the right of a citizen or alien—it does not make any difference which—to advocate murder?

"Mr. Baldwin: Yes.

"The Chairman: Or assassination?

"Mr. Baldwin: Yes.

"The Chairman: Does your organization uphold the right of an American citizen to advocate force and violence for the overthrow of the Government?

"Mr. Baldwin: Certainly, in so far as mere advocacy is concerned.

"The Chairman: Does it uphold the right of an alien in this country to urge the overthrow and advocate the overthrow of the government by force and violence?

"Mr. Baldwin: Precisely on the same basis as any citizen.

"The Chairman: You do uphold the right of an alien to advocate the overthrow of the government by force and violence?

"Mr. Baldwin: Sure; certainly. It is the healthiest kind of thing for a country, of course, to have free speech—unlimited.

"Whereas, the same Roger N. Baldwin is now the leading advocate of the C. I. O. movement; and

"Whereas, the C. I. O., in permitting this man to be its spokesman stands accused of condoning his Un-Americanism and Communistic leanings, and the C. I. O. should be condemned for its Un-American tactics, * * *

 * * * * * *

"Now, Therefore, Be it

"Resolved that we request the said Daniel Casey, Director of Public Safety, to refuse and deny the application made for such a permit, and be it Further

"Resolved, that we now record our firm opposition and protest against allowing this slacker and his Communistic associates to appear publicly in Jersey City, whose citizens are devoted to American principles and the upholding of our American traditions, and be it Further

"Resolved, that we consider a man convicted of the crime of evading the draft to be thoroughly Un-American in his principles and unworthy of receiving any consideration at the hands of public officials, especially the right to speak from a public platform in the streets of Jersey City, and that we also consider that any organization which permits this man to be associated with them is also unworthy of any consideration on the part of public officials and they should not be given the right to use our public streets for the purpose of spreading Communistic and Un-American doctrines * * *."

Local unions affiliated with the American Federation of Labor and many others sent additional protests to the Director.

The plaintiffs had been trying for sometime to secure permits to hold public meetings in Jersey City at which Norman Thomas, Roger N. Baldwin and others were to speak. Many newspapers circulated in Jersey City contained statements of an intended "invasion" of Jersey City by the C. I. O. For instance, the following appeared in the Newark Evening News, the largest newspaper in New Jersey and one of the most reliable in the country:

"CIO Prepared
For Invasion
Mass Drive by 3,000 to Be
Launched Monday in
Jersey City

"Final plans for their invasion of Jersey City were completed last night by New Jersey CIO leaders. A mass organization drive by 3,000 CIO representatives will be launched Monday afternoon as workers leave plants in the downtown area of the city.

"Aside from field organizers of international unions, more than 28,000 volunteers will distribute leaflets in an area bounded by Bay and 17th Streets, Jersey City. Of that number more than 2,000 will be from the International Maritime Union.

"Other organizations which will send groups include the Civil Liberties Union, International Labor Defense, Workers Defense League and the Hudson County Committee for Civil Rights.

"Many Arrests Expected.

"Those participating in the drive will assemble in Jersey City at a given point. They will then march to the city's largest plants where leaflets will be handed out. Many arrests are expected in view of the city's ordinance prohibiting distribution of leaflets.

"William J. Carney, CIO regional director and leader of the drive, will go to Washington tomorrow to confer with a member of the Senate Civil Liberties Committee. Carney said a member of the committee will be in Jersey City Monday as an observer.

"Showdown with Hague."

Carney added:

"Our plans for a showdown between CIO and I-Am-The-Law-Hague have been completed. We will go to Jersey City to organize in a peaceful manner. Whether this will be possible in the face of denials of civil rights in that city I am unable to say at this time.

"Workers in Hudson County have even been denied the right to strike. Police of Jersey City have tried to stop picketing without a court injunction, so easily obtained in Hudson County.

"When our organizers enter Jersey City they are stopped by police, threatened and searched. The contents of their cars are strewn over the highway. At our organization meetings police even threaten the workers wot attend. Hague has gotten away with this too long.

"The Acts of various Jersey City officials may very well come within the scope of prosecution and indictment by the Federal Government. Various acts committed by Jersey City officials are crimes under the United States Criminal Code, punishable by a heavy fine and imprisonment up to ten years.

"Section 51 of the code [18 U.S.C.A. § 51] prohibits conspiracy to injure persons in exercise of civil rights. Section 7 of the Wagner Act [29 U.S.C.A. § 157] says employees shall have the right to join or assist labor organizations and to engage in concerted activities for mutual aid and protection.

"Hague may be the law in Jersey City, but he is not the law of the country."

The plaintiffs now say that these accounts were only headlines and no such numbers invaded Jersey City as the papers stated. However that may be, it might be pertinent to ask who was responsible for the headlines and statements, for such papers as the Newark Evening News are not in the habit of publishing unreliable information and the Director did not and could not know what was going to happen for it evidently was not he who informed the newspapers of the reported "invasion". He was justified in believing and seriously considering what such newspapers said.

The newspapers circulated in Jersey City at this time carried pictures of Norman Thomas and other socialists and communists at the May Day Celebration in New York City giving the communistic clenched-fist salute and singing the Internationale.

These things show only in part what was going on in and about Jersey City. All of this had the tendency to excite and doubtless did excite, incite and inflame the people of Jersey City and especially the veterans. The Director had a serious situation with which to contend. The responsibility rested upon him. He was urged on every hand to refuse the permit under threatened violence. Finally after investigating the facts and circumstances pertinent to the application, he wrote the following letter, on December 30, 1937, to the attorney of the plaintiffs refusing the permit:

"Department of Public Safety
City Hall
Jersey City, N. J.
December 30, 1937
"Spaulding Frazer, Esq., 744 Broad Street, Newark, New Jersey

"Dear sir: I hereby answer your letter of December 23, 1937, addressed to me as Director of Public Safety, in which you make application for a permit to hold an open air meeting in Jersey City, which meeting will, according to you, be addressed by Congressman Jerry O'Connell, Roger N. Baldwin, William J. Carney, Al. Barkin, Sam Macri and John Kiesler.

"On receipt of your letter, I sent you a communication, dated December 27, 1937, in which I informed you that I would, as required by ordinance, make prompt investigation of all of the facts and circumstances pertinent to your application before deciding whether to grant or refuse the issuance of the permit requested. On the same day, December 27, 1937, I received a communication written on behalf of certain Veterans' organizations of Jersey City, protesting against the granting of a permit to Roger N. Baldwin or to any members of the group he represents, to hold a meeting. The letter demanded that I withhold action on your application. I attach a copy of the Veterans' letter to this communication.

"On the evening of December 28, 1937, a great mass meeting was held in the Armory at Jersey City, attended by over three thousand persons, all of whom were veterans. At that meeting a resolution of opposition was passed against the granting of the permit. Violent disorder was threatened on the part of the veterans in case the meeting was held. Announcements were made from the floor—and these announcements had the approval of the meeting—that if I should refuse to honor the Veterans' protest and grant a permit for the meeting, the Veterans would take the matter into their own hands and see to it that the meeting would be broken up. I refer you to copies of the local papers of Jersey City, which give an account of this meeting. I also enclose a copy of the resolution passed by the Veterans at the meeting.

"The Chamber of Commerce, representing the business interest of Jersey City, have gone on record against the granting of this permit.

"The Central Labor body of Hudson County has gone on record against the granting of this permit.

"Other bodies of citizens have opposed it, and individuals of influence in the community have protested to me against the holding of the meeting. Other facts and circumstances pertinent to your meeting, in addition to those herein called to your attention, convince me that the granting of the permit you request would lead to riots, disturbances and disorderly assemblage.

"Therefore, I hereby refuse to issue the permit for an open air meeting requested by you in your letter of December 27, 1937, and my refusal is for the purpose of preventing riots, disturbances and disorderly assemblage.

"Very truly yours,
"Daniel Casey, Director"

The refusal of the permit was a ministerial act on the part of the Director and unless he grossly abused the discretion and

authority which the ordinance vested in him, his action should not be reversed and the judgment of the court substituted for his. Gaines v. Thompson, 74 U.S. 347, 7 Wall. 347, 19 L.Ed. 62; Ness v. Fisher, 223 U.S. 683, 32 S.Ct. 356, 56 L.Ed. 610; Louisiana v. McAdoo, 234 U.S. 627, 633, 34 S.Ct. 938, 58 L.Ed. 1506; Work v. U. S. ex rel. Rives, 267 U.S. 175, 183, 45 S.Ct. 252, 69 L.Ed. 561; Proctor & Gamble Co. v. Coe, 68 App.D.C. 246, 96 F.2d 518, 520.

The Supreme Court of New Jersey found in the Thomas case, supra, that he had not abused his discretion or authority. Mr. Justice Bodine who wrote the opinion in that case said, "The Director of Public Safety knows the temper of the people he serves". He represented Jersey City and if a riot, disturbance or disorderly assemblage had resulted from the granting of the permit the city would have been responsible. The Statute of New Jersey on this subject provides that:

"Any person who, by reason of mob violence as defined and stated in sections 2:152–1 to 2:152–3 of this title, suffers material damage to his property or injury to his person shall have an action against the city in which such damage is suffered or injury inflicted, or, if not in a city, then against the county in which such damage is suffered or injury inflicted for such damages as he may sustain, to an amount not exceeding five thousand dollars." Revised Statutes of New Jersey, 2:63–10.

Under similar statutes or ordinances, municipalities in many states have been held liable for large damages caused by mobs, riots and disorderly assemblages. Right now the Apex Hosiery Company is suing the City of Philadelphia for more than $3,000,000 damages resulting from riots, disturbances or disorderly assemblage. In honestly administering this ordinance, who could say with any degree of certainty that as the result of the issuance of the permit in question, a mob, riot or disorderly assemblage would not have occurred and that considerable damage to persons or property or both would not have been done. Whose judgment under these circumstances was to be followed, the Director's, the District Court's or this court's? The ordinance says the Director's. The Supreme Court of New Jersey said the Director's. The Supreme Court of the United States in the Davis case said the Director's and every other court in the country which has considered the question under similar ordinances and circumstances, has said the Director's and not the court's.

I have not forgotten that the plaintiffs charged that the officials of Jersey City influenced and intimidated the owners of private halls against the plaintiffs so that they would not rent them for meetings; and further that they incited and stirred up the various organizations to protest against granting permits for public meetings. All of this the defendants denied.

The learned trial judge who saw all the witnesses and was in the atmosphere of the trial for weeks refused to find that the evidence sustained the charge that the officials of Jersey City influenced and intimidated the owners of private halls. He also refused to find that they or any of them had incited or stirred up the people to protest. Yet this court, in effect overruling the learned trial judge, and in the face of the statement of counsel for the plaintiffs, when arguing this case, that Mayor Hague was one of the most honest witnesses he had ever seen on the stand, found that the defendants, notwithstanding the Mayor's denial, "endeavored to build up a dangerous situation, one in which sympathizers of the appellees could not safely speak" though it had never seen or heard a single witness testify.

Thousands of permits, we are told, were issued in the past, but the Director refused to issue a permit to plaintiffs. This alone shows discrimination in the opinion of this court, but this is a non sequitur. The facts and circumstances under which a meeting is to be held determine whether a permit should be issued or refused and whether or not discrimination has been practiced. The Director may grant one permit and refuse another the same day without denying "any person" "the equal protection of the laws" as required by the Fourteenth Amendment. If the Director had reasonable grounds to believe that the meeting for which he refused a permit would have resulted in riots, disturbances or disorderly assemblage, or any one of these, and that those meetings for which he granted permits would not, his refusal did not discriminate against "any person", or deny to him "the equal protection of the laws."

We do not have in this case the naked question of the right of free speech or free assembly within the meaning of the Constitution of the United States. The issue

here is not primarily free speech at all, but the plaintiffs are seeking to make it such. We have here a number of individuals and organizations which have combined and are masquerading under the flag of free speech as though this were the sole issue.

If the primary question here were the maintenance of free speech, the defense of the Constitution of the United States or the principles upon which democracies are founded, can anyone doubt where these protesting organizations—The American Legion, Veterans of Foreign Wars, Hudson County American Legion, and others— would stand? Many of these men have risked their very lives in the service of their country, "to make democracy safe for the world", to defend free speech, the Constitution of the United States and the principles upon which democracies are built.

The defendants contend that the District Court was without jurisdiction in this case. The plaintiffs, on the contrary, say that it has jurisdiction under sections 24 (1) and 24 (14) of the Judicial Code, 28 U.S.C.A. § 41(1, 14). This was averred in paragraphs 6 and 7 of the bill. It is alleged in paragraph 6 that this is a suit of a civil nature, in equity, arising under the Constitution and laws of the United States, in which the amount in controversy exceeds $3,000 exclusive of interest and costs. This allegation was based upon Title 28 U.S.C.A. § 41 (1), Sec. 24 (1) Judicial Code.

Did the value of the civil rights of which the plaintiffs alleged they were deprived exceed $3,000, exclusive of interest and costs?

There is no allegation as to the value of these rights except the bald statement that they exceed $3,000. Of course, as the majority opinion says, in tort actions, the jury in a proper case, when the damnum is sufficiently laid, may award exemplary damages which may be added to the actual damages suffered in order to make up the jurisdictional amount. Barry v. Edmunds, 116 U.S. 550, 6 S.Ct. 501, 29 L.Ed. 729; Scott v. Donald, 165 U.S. 58, 89, 17 S.Ct. 265, 41 L.Ed. 632. Where the plaintiff in good faith claims the jurisdictional amount in damages, it is sufficient, if not traversed, to give the court jurisdiction. Wiley v. Sinkler, 179 U.S. 58, 21 S.Ct. 17, 45 L.Ed. 84; Smithers v. Smith, 204 U.S. 632, 27 S. Ct. 297, 51 L.Ed. 656. But where the sufficiency of the jurisdictional amount is timely and appropriately challenged, as was done in the case at bar, the plaintiff must support the allegations by competent proof. The burden of establishing the jurisdictional facts is on the plaintiff throughout the litigation. KVOS, Inc., v. Associated Press, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183. This the plaintiffs did not do. There is not a word showing the pecuniary value of the rights of which they complain they were deprived and the finding of fact as to this value was a mere guess.

However, I think that the court had jurisdiction under section 24 (14) of the Judicial Code as this court found.

The decree of the District Court should be affirmed as to A. 1, 2, and 3, and B. 1, 2 and 3, but reversed as to B. 4 (a), (b), (c) and (d).