Jack L. Nicoll, M.
On the morning of February 22, 1956 the defendants John Carcel and Lydia Collazo appeared before the main entrance to the United Nations on the easterly side of First Avenue between 45th Street and 46th Street, New York City. The defendant Carcel stood quietly before the main entrance distributing leaflets to the persons passing by. The leaflets called for the independence of Puerto Bico upon the ground that the United States had invaded Puerto Bico and thus committed the crime of genocide. The leaflets further stated that the United States forces had established a reign of terror in Puerto Bico. The defendant Collazo walked back and forth in front of the main entrance within a space of 20 feet carrying a raised placard bearing on the front side thereof, ‘‘ Free the Puerto Bican Prisoners and on the reverse side, “ We demand Independence.” The defendant Carcel stood quietly distributing leaflets except to move from side to side to permit the passage of the many thousands seeking entry to the United Nations. The defendant Collazo was also quietly parading back and forth. Being Washington’s Birthday thousands of people were using the entrance, in addition to the personnel and officials of the 76 Member Nations of the United Nations; in addition thereto delegations, secretariat staff and those who came to transact business.
At about 10:30 a.m. of this morning, about 30 minutes after the defendants began their picketing a member of the New York police force approached the two defendants and stated that he had received a complaint from an official of the United Nations *829 relative to picketing and asked the two defendants to move over to the westerly side of First Avenue to do their picketing. The defendant Carcel answered, “ The sidewalk he was standing upon was international property and that the police officer had no jurisdiction there. ’ ’ The police officer then called the station house and returned to the scene of the picketing and stated he observed the two defendants blocking the main entrance to the United Nations and the free passage of the many people entering therein. A police sergeant then arrived pursuant to the police officer’s telephone call and the sergeant asked the two defendants to cross to the west side of First Avenue and continue their picketing on that side. The defendants refusing so to do were thereupon arrested and charged with disorderly conduct under section 722 of the Penal Law of the State of New York.
On June 26, 1947 the President of the United States was authorized to enter into an Agreement with the United Nations regarding the headquarters of the United Nations to be located in New York City. On August 4, 1947 the said Agreement was executed. (61 U. S. Stat. 756; 80th Cong. 1st Sess., ch. 4821, Public Law 357, hereinafter designated as the Agreement.)
Under Annex 1 of the Agreement the headquarters district of the United Nations was described as follows: “ The area referred to in Section 1 (a) (1) consists of (a) the premises bounded on the East by the westerly side of Franklin D. Roosevelt Drive, on the West by the easterly side of First Avenue, on the North by the southerly side of East Forty-eighth Street, and on the South by the northerly side of East Forty-second Street, all as proposed to be widened, in the Borough of Manhattan, City and State of New York, and (b) an easement over Franklin D. Roosevelt Drive, above a lower limiting plane to be fixed for the construction and maintenance of an esplanade, together with the structures thereon and foundations and columns to support the same in locations below such limiting plane, the entire area to be more definitely defined by supplemental agreement .between the United Nations and the United States of America.”
Section 8 of the Agreement provides in part as follows: ‘‘ The United Nations shall have the power to make regulations, operative within the headquarters district, for the purpose of establishing therein conditions in all respects necessary for the full execution of its functions. No federal, state or local law or regulation of the United States which is inconsistent with a regulation of the United Nations authorized by this section shall, to the extent of such inconsistency, be applicable within the headquarters district.”
*830 Subdivision (a) of section 9 in part reads as follows: “ The headquarters district shall be inviolable. Federal, state or local officers or officials of the United States, whether administrative, judicial, military or police, shall not enter the headquarters district to perform any official duties therein except with the consent of and under conditions agreed to by the Secretary-General. ’’
Subdivision (b) of section 9 provides as follows: “ Without prejudice to the provisions of the General Convention or Article IV of this agreement, the United Nations shall prevent the headquarters district from becoming a refuge either for persons who are avoiding arrest under the federal, state, or local law of the United States or are required by the Government of the United States for extradition to another country, or for persons who are endeavoring to avoid service of legal process.”
Article VI of the Agreement relates to police protection of the headquarters district, and subdivision (a) of section 16 provides as follows: ‘‘ The appropriate American authorities shall exercise due diligence to ensure that the tranquility of the headquarters district is not disturbed by the unauthorized entry of groups of persons from outside or by disturbances in its immediate vicinity and shall cause to be provided on the boundaries of the headquarters district such police protection as is required for these purposes.”
Section 18 of the Agreement provides in part as follows: “ The appropriate American authorities shall take all reasonable steps to ensure that the amenities of the headquarters district are not prejudiced and the purposes for which the district is required are not obstructed by any use made of the land in the vicinity of the district.”
Counsel for the defendants in his brief submitted herein waives the defendants ’ claim that the situs wherein the incident involved herein took place as being international in character and concedes the jurisdiction of this court, and accordingly the jurisdiction of the police department to act.
The defendants claim that under the First and Fourteenth Amendments to the Constitution of the United States and by sections 1, 3, 8 and 9 of article I of the New York State Constitution the arrest herein was a direct violation of their right to freedom of speech and assemblage and that the arrest herein operated in derogation of their rights.
The United Nations consists of 76 Member Nations and other States, not members thereof, send official representatives, as do many dependent territories and nongovernmental organiza *831 tions from all over the world. On any average day, even when the General Assembly is not meeting, more than 10,000 persons enter the building. Some 3,000 take the guided tours. The public seating capacity for those who come to attend meetings is 3,000. In addition there are delegations, secretariat staff and others who come to transact business. A city bus line has its stop there. Chartered buses, frequently several at one time, arrive and park in a recess at the main public entrance, which is also fed by a taxi rank. Official delegation cars moving delegates to and from the many meetings of the United Nations pull into one entrance and emerge within a few feet of the main entrance which was here picketed.
In Frend v. United States (100 F. 2d 691, cert, denied 306 U. S. 640) the United States Court of Appeals for the District of Columbia upheld a resolution of the Congress of the United States making it unlawful within 500 feet of an embassy, legation or consulate in the District of Columbia to display placards or devices adapted to bring into public disrepute any foreign government or organization or its political, social or economic acts or views, and to refuse to disperse after being ordered to do so by the police department, the court holding (p. 693), “ The resolution, interpreted in the light of its purpose and according to the limitations of the Constitution, places no restriction upon speech or assembly except to the extent that they may constitute offensive public demonstrations calculated to arouse passions and resentments in those governments with which we have official relations, and then only when such offensive conduct is committed upon the public streets immediately adjacent to embassies, legations, consulates, and other buildings used for official purposes by such governments. These are reasonable and proper restrictions. In them there is no abridgement of the right of speech or of assembly or of any other constitutional right of the citizen.” (Hague v. Committee for Ind. Organisation, 101 F. 2d 774; De Jonge v. Oregon, 299 U. S. 353.)
It is rather evident that because of the necessity of affording to the Member Nations of the United Nations such protection as will not involve the United States in any difficulty with the members of the United Nations because of the failure on the part of the United States as a host to give ample protection to the members, the courts have felt it proper to approve such measures which aid towards the protection of foreign governments. This principle has been set forth in Hyde on International Law Chiefly as Interpreted and Applied by the United States (2d rev. ed.7 Vol. 1, p. 17). It is indeed a duty upon the United *832 States to take reasonable precautions to prevent the doing of things which might lead to a disruption of the proceedings of the United Nations.
The Agreement entered into between the United Nations and the United States setting up the headquarters in New York City provides, as heretofore stated in section 18 thereof, that ‘‘ The appropriate American authorities shall take all reasonable steps to ensure that the amenities of the headquarters district are not prejudiced and the purposes for which the district is required are not obstructed by any use made of the land in the vicinity of the district.”
Under the Agreement the police force of necessity would be the Police Department of the City of New York and section 435 of the Charter of the City of New York in part gives the New York City Police Department the right to set up certain rules and regulations to preserve the public peace as follows: ‘‘ The police department and force shall have the power and it shall be their duty to preserve the public peace * * * disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public streets, sidewalks, parks and places; * * * regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; remove all nuisances in the public streets, parks and places; * * * enforce and prevent the violation of all laws and ordinances in force in the city ’’.
The defendants further contend herein that the People have failed to prove a breach of the peace herein. In People v. Galpern (259 N. Y. 279) a police officer asked the defendant who was debating with friends as to where to go to eat on a summer’s evening on East 14th Street in New York City to move on as he was interfering with the flow of traffic; defendant who was an attorney refused to accede to the officer’s request and was arrested and charged with disorderly conduct. The Court of Appeals in upholding the conviction held by Lehman, J. (p. 284): “ they must ‘ move on ’ when a police officer so directs for the purpose of avoiding possible disorder which otherwise might ensue. * * * that provision tends to preserve public order on the streets of a great city. A refusal to obey such an order can only be justified where the circumstances show conclusively that the police officer’s direction was purely arbitrary and was not calculated in any way to promote the public order.” (People v. Nixon, 248 N. Y. 182, 188; People v. Ward, 272 N. Y. 615.)
*833 Since under section 18 of the Agreement between the United Nations and the United States, it is the duty of the American authorities to take all reasonable steps to ensure the amenities of the headquarters district, I hold that the police officer acted within the scope of his authority and duty to act as he did herein and that the conduct of the defendants were such that under the circumstances herein it comes within the purview of section 722 of the Penal Law of this State. I, therefore, find the defendants guilty.